65 N.J. Super. 1 (1960)
166 A.2d 777
CITY OF TRENTON, APPELLANT,
v.
STATE OF NEW JERSEY, DIVISION OF TAX APPEALS, DEPARTMENT OF THE TREASURY, AND RIDER COLLEGE, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 21, 1960.
Decided December 29, 1960.
*3 Before Judges CONFORD, FREUND and KILKENNY.
Mr. John A. Brieger argued the cause for appellant (Messrs. Louis Josephson and John A. Brieger, attorneys).
Mr. Crawford Jamieson argued the cause for respondent Rider College (Messrs. Jamieson, Walsh and McCardell, attorneys; Mr. Peter P. Walsh, Jr. on the brief).
The opinion of the court was delivered by KILKENNY, J.A.D.
The State Division of Tax Appeals ordered the cancellation of property tax assessments for the years 1957 and 1958 levied by the City of Trenton against 29 properties owned by Rider College and located in that city. In doing so, the State Division upheld the college's contention that it was entitled to tax exemption under N.J.S.A. 54:4-3.6, which provides, inter alia, tax exemption in favor of:
"* * * all buildings actually used for colleges, schools, academies or seminaries; provided, * * * the buildings or the lands upon which they stand, or the associations, corporations, or institutions using and occupying them as aforesaid are not conducted for profit." (Emphasis supplied)
On the city's appeal from the judgments of the State Division, the issue is whether Rider College was as of the *4 assessing dates for the tax years 1957 and 1958 an institution "not conducted for profit."
Rider College had made previous applications for the same tax relief on the same ground, but had been unsuccessful. In connection with its appeal from a 1940 tax assessment, the Supreme Court ruled adversely to it and the Court of Errors and Appeals affirmed on the opinion below. The Supreme Court found that the proofs were not "free from doubt," and that the college had failed to carry the burden of proof imposed by law that it was a "fundamentally charitable institution" not for profit. City of Trenton v. State Board of Tax Appeals, 127 N.J.L. 105 (1941), affirmed City of Trenton v. Rider College, 128 N.J.L. 320 (E. & A. 1942). Our present Supreme Court, in the case of The Kimberly School v. Town of Montclair, 2 N.J. 28, 39 (1949), succinctly stated the reason for that earlier Rider College decision, when it said:
"[It] bore the obvious brand of an essentially commercial undertaking, with an accumulated surplus between $140,000 and $165,000, and a net income of $17,000 for the tax year in question after the payment of substantial salaries to its managing and teaching staff and to seven `salesmen' as well as the expenditure of $18,000 for other advertising."
Rider College next sought tax exemption as to the 1953 assessment and after a denial by the Mercer County Board of Taxation, which action was affirmed by the State Division, it appealed to the Appellate Division. In that new appeal, it relied on certain changes in its corporate structure and method of operation, which it had made to overcome its earlier characterization as a commercial undertaking.
The college had been founded in 1865 and incorporated in 1897 under the general enabling act of 1890. From 1901 to 1934 it was operated as a private proprietary educational institution by the shareholders, Moore and Gill, who were also, respectively president and dean. It continued to be so operated, after their deaths in 1934, until 1941, *5 by their sons, who took the positions, respectively, of president and vice-president. Following the death of the elders, Moore and Gill, their interests were sold by their estates to the corporation for $98,000 cash. In 1942, after the above adverse decision, the college reincorporated under the provisions of Title 15, "Corporations and Associations Not for Profit," and it has operated under this non-profit charter ever since. The old board of governors was supplanted by a board of trustees. No stock, of course, is issuable or was issued under the new non-profit corporate set-up. The juniors, Moore and Gill, retained their former positions.
The Appellate Division, in this second case, Rider College v. State Division of Tax Appeals, Docket A-461-54, in an opinion filed February 17, 1956, not officially reported, after noting the changes made by the college, concluded that the school had been operated substantially in the same manner since the earlier decision as it had been operated prior to that decision. The endowment fund, referred to as amounting to between $140,000 and $165,000 in 1939, had increased to $1,503,440.09 on August 15, 1953. This was due largely to an excess of receipts over expenditures during the 15 years in question. The actual value of the assets of the college as of the same date was $2,156,351.88. From the standpoint of salary and control, no substantial change had been made between the 1940 case and the assessing date applicable to the 1953 case. "Vocational advisers," denominated by the Supreme Court as "salesmen," drawing substantial salaries, continued to perform the same services of soliciting admissions to the college. And so with other details of management and operation, the same substantial pattern persisted despite the ostensible change to a "non profit" organization. Accordingly, the claim of tax exemption was again denied.
It is clear that those earlier adverse decisions do not per se preclude Rider College from applying again for tax exemption as to the 1957 and 1958 levies. But it is also true that the burden of proving its tax-exempt status is upon the college, and that when the right to relief is not clear, *6 exemption is to be denied. Princeton Country Day School v. State Board of Tax Appeals, 113 N.J.L. 515 (Sup. Ct. 1934); Jamouneau v. Division of Tax Appeals, 2 N.J. 325 (1949). If the facts presented on the present appeal were substantially the same as those found in the 1953 tax case, there would be no justification for disturbing that sound determination on the facts then adduced. For that decision was bottomed upon the test of tax exemption laid down by our Supreme Court in The Kimberly School v. Town of Montclair, supra. As stated therein, 2 N.J., at page 37:
"It is our conception that the test imposed by the statute is simply, in the words of Mr. Justice Swayze, whether or not the school is `conducted for the purpose of making a profit' (Institute of Holy Angels v. Bender, 79 N.J.L. 34, 36 (Sup. Ct. 1909); see also Princeton v. State Board of Taxes, 96 N.J.L. 334, 339 (Sup. Ct. 1921)). Each institution seeking exemption must be examined in the light of its past and present scheme of operation to determine its eligibility, due regard being had not so much for the question of whether its income exceeds the cost of operation in any particular year or years, but rather whether charges are fixed with the obvious intention of yielding a profit. Although necessarily viewed as a whole, the many facets of the organization and the operation of a school must each be considered and its significance appraised. Thus, in the application of the statutory test, the court will look to the background and nature of the organization of the school; the character and nature of the membership of its board of trustees or other governing body, particularly where former private owners are there represented; the amount of its income as compared with its costs of operation; the amount of any excess of income over costs, and the actual and possible use of such excess; the existence and extent of its accumulated surplus and the purpose to which it may be put; and the amount of tuition charges as compared with those of similar schools; the scale of salaries paid to its teachers and officials as compared with similar schools, public as well as private; and the many other factors bearing upon the ascertainment of the dominant motive in conduct of the school which need not now be detailed."
What changes have been made in the status or modus operandi of Rider College since the adverse decisions affecting the 1940 and 1953 tax assessments, which would entitle this school to exemption as to 1957 and 1958 taxes under the *7 aforementioned test? We note the following changes, withholding for the moment determination of their sufficiency to meet the test.
1. In 1953 Rider College was merely a business school. By 1959 it had broadened its educational curricula to comprehend, as well, schools in the liberal and fine arts, sciences, economics, education and journalism.
2. In 1955 the college was accredited by the Middle States Association of Colleges and Secondary Schools, which does not accredit "proprietary" institutions.
3. Under its by-laws effective in 1956, the assets of the college, in the event of dissolution, are to be distributed to such non-profit educational institutions as the board of trustees shall designate or, upon failure to designate within five years, as the Chief Justice of the New Jersey Supreme Court shall designate. Thus, the accumulation of surplus income cannot inure to the benefit of some individual or group of individuals, or to some profit organization. Anyone interested in that distribution can forestall by court action distribution to a fictitious or spurious "non profit" educational institution.
4. Under the by-laws as they existed in 1940, "all surplus moneys taken in by the college as tuition fees over and above the operating expenses of the college" were allocated to one "endowment" fund; while "gifts, contributions, bequests and devises" were allocated to a second "endowment" fund. The moneys in the first fund might be expended for "such other purposes as the Board of Governors may unanimously determine." Moore and Gill were members of the board. This was like an ordinary business fund which business corporations often set up to provide for unexpected contingencies. The existence of this fund cast doubt on the bona fides of the assertion of non-profit operation. For example, control of the board by Moore and Gill could result in the grant of bonuses to them in lieu of dividends. However, with reincorporation, the by-laws provided for a single fund embracing income from whatever source (except restricted gifts) *8 administered by a board of trustees of which Moore and Gill may not be members, and the principal of which may not be used for purposes other than enlargement or replacement of college facilities. There is a proviso permitting the payment of obligations of the college as determined by the board. Thus, these new rules for administering the fund are somewhat more restrictive and bear fewer earmarks of business reserve funds than did those in 1940.
5. The 1940 by-laws empowered the president to veto changes therein and regulations adopted by the board of governors. This invitation to abuse is not part of the present by-laws.
6. The 1940 by-laws provided for meetings of the board but once a year, the business of the college to be run in the interim by an executive committee, of which Moore and Gill were members ex officio. Presently, they are barred from membership on the board of trustees, which is required to meet at least six times annually. They are also prevented by the by-laws from serving on the executive committee.
7. Neither Moore nor Gill now has a contract with the college and both may be summarily dismissed by the board without cause.
8. The board now consists of 12 men, four of whom are elected by the alumni. Included among the trustees are seven or eight important executives of national manufacturing companies, a vice-president of a Trenton bank, a senior partner in a banking investment company, a special agent for a life insurance company, and Mr. Crawford Jamieson, the well-known attorney, who represents the college in this action. They all serve as trustees without remuneration.
9. The college now awards annually a number of modest scholarships, enjoyed by about 10% of its students.
10. The tuition charged and requirements for admission are on a par with schools of comparable size and standing, as are the faculty salaries paid.
*9 11. Prior to 1952 the college seems to have operated at a profit each year. From 1952 through 1956 it operated at a loss. In 1957 and 1958 it was again operating at a profit, but the operating expenses for the latter two years do not reflect depreciation of certain real estate. Noninclusion of this item results from the fact that the books are now kept and statements are prepared in accordance with the "fund" accounting method, a system commonly used by non-profit educational institutions. Depreciation of the educational plant is not considered an "expense."
12. The "vocational advisers," or "admissions counsellors," referred to in earlier decisions as "salesmen," no longer function as salesmen, and are no longer paid on a commission basis for the number of students enrolled by them.
They receive straight salaries, not affected by the number of students enrolled. They visit high schools and aid in screening the candidates for admission to the college. They participate in high school "career" programs. Their services are of the same character as those of similar officials employed by most first-rate colleges. There are no longer the national and local advertising and mailing lists of the former operation. The enrollment is selective, and students are dropped annually for poor scholastic work.
The "profits" of $120,412.59 in 1957 and $118,006.35 in 1958 are not as substantial as might appear at first blush. For example, while the 1957 receipts exceeded expenditures by $120,412.59, that excess included approximately $90,000 in gifts and income from endowment securities. Furthermore, no deduction therefrom was taken for depreciation. A most significant change is evidenced by comparing the 1946-1951 financial return with that of 1952-1958. The excesses of revenue for the years 1946 through 1951 approximated $1,000,000 due in large measure to the post-war swollen classes, which resulted from increased enrollment of veterans taking advantage of educational opportunities at the government expense. But the operation of the college over the past seven-year period of 1952 through 1958 shows *10 a net operational loss in excess of $135,000, despite the fact that during that time it received substantial sums from gifts, income from endowment securities, and proceeds from the sale of endowment securities. The school population of Rider College has steadily increased from 1886 for the school year 1956-1957, to 2554 for the school year 1958-1959. The large cash surplus which existed in 1953, except for $200,000, has been used to develop the new and large college campus in Lawrence Township. No longer is there any large unused cash surplus suggestive of possible self-interest.
It is also noteworthy that the new campus development required, besides the utilization of its previous surplus, local bank loans of $850,000, and an additional loan of $1,000,000, which was granted at 2 7/8% interest by the Federal Housing and Home Finance Agency on the status of Rider College as a non-profit educational institution.
We perceive nothing in the statute requiring, as a condition of tax exemption, that a non-profit educational institution must actually operate at a loss, or that it must gear its tuition rates and other receipts so as to avoid an excess of income over current expenditures. To hold that a college may not accumulate a surplus, even though accomplished in some measure by the generosity of donors, without losing tax-exempt status, would be tantamount to declaring that such institutions may not plan on a sound fiscal basis for the replacement of antiquated facilities or the expansion of facilities almost all colleges are finding necessary to accommodate the ever-mounting demands for a college education. The tax statute imposes no such sanction.
There is no assertion by the city or showing of any bad faith in the claim of Rider College that, regardless of its earlier history, it was not as of the tax years in question, and presently is not, conducted for profit. We find no evidence of a profit motive or profit-making enuring to the benefit of any individual or group of individuals, or of the institution itself. The deficit budgets of the college for several years since 1953 negative an intent to operate with *11 a profit motive. There is no siphoning off of the profits under the guise of excessive salaries, fees, bonuses, or otherwise, received by any of the paid personnel. Their income is comparable to that received by others similarly employed in comparable institutions. No one is paid for doing nothing. The board of trustees is unsalaried and receives no compensation for the services rendered. There are no dividends payable to anyone, because there are no stockholders. Whatever surplus has existed in the past has been put back into the expansion of the college properties, educational equipment and facilities.
Rider College's non-profit status has not been challenged for federal tax purposes. Its receipt of gifts from its alumni, grants from the Ford Foundation, and contributions from leading industries are a public recognition of its non-profit status. While these acknowledgments of the college's non-profit status by the Federal Government and its agencies, and by the Ford Foundation and industries, are not binding upon the court, they lend confirmation to the reasonableness of the State Division's finding.
Obviously, Rider College is not fundamentally "charitable or philanthropic." But that judge-made condition of statutory tax exemption, College of Paterson v. State Board of Tax Appeals, 131 N.J.L. 57 (Sup. Ct. 1943), was expressly abandoned in The Kimberly School v. Town of Montclair, supra. See 4 Rutgers L. Rev. 109, 110 (1949). We presume that the college intends from year to year to make ends meet and probably to have a surplus at the end of the fiscal year. Ordinary business judgment demands that, and entirely consistently with the absence of a profit motive. But Rider College has not always succeeded, as some annual deficits demonstrate.
A prudent and foresighted board of trustees of any non-profit educational institution ought to strive to avoid annual deficits, so as to minimize dependence upon solicitations from the alumni and others. But the intent to have an operating surplus or "profit," rather than a loss, does not mean that *12 the motive for the school's continued existence and operation is the making of a profit. The dominant motive to foster education and to make a college readily available to those of the public seeking higher education may coexist with an intention to have the books balance in the black rather than in the red.
If the college does show operational surpluses for some years, the crucial inquiry is, "Who gets the money?" If we can trace it into someone's personal pocket, as the raison d'etre of the school, then, even though the form of operation is that of a so-called "non profit" organization, the college is not entitled to tax exemption, despite its educational function. Town of Montclair v. State Board, etc., 86 N.J.L. 497 (Sup. Ct. 1914), affirmed 88 N.J.L. 374 (E. & A. 1915). Such an enterprise is commercial. But when we find, as here, that the surpluses, if any, go back only into the maintenance, expansion, and development of the school and its facilities, and that no individual can obtain anything more than just compensation for services, either presently or in the future, and that the funds of the institution cannot possibly be diverted to non-institutional uses, there cannot be said to be a profit-motive in the operation of the school. In granting tax exemption to the "colleges * * * not conducted for profit," the State does not demand that no "profit" shall be made in any year, but rather that the real purpose of the school's existence shall not be the making of money. So long as that "profit" goes back into the cause of education, it subserves the public need of training our youth. The task of providing adequate college facilities has not been and is not fully met today and probably cannot be fully met by the State without substantial increases in public expenditures. The tax exemption statute is a fair quid pro quo or recognition from the State to institutions like Rider College for sharing the State's educational burden. "Undeniably it is the public benefit resulting from education that justifies granting schools and colleges exemption from taxation, * * *." The *13 Kimberly School case, supra, 2 N.J., at page 42. The rationale of the exemption is that the State is actually being relieved pro tanto from the necessity of performing a service essentially public, such as education. Rutgers Chapter, etc. v. City of New Brunswick, 129 N.J.L. 238, 241 (Sup. Ct. 1942), affirmed 130 N.J.L. 216 (E. & A. 1943); Carteret Academy v. State Board of Taxes, 102 N.J.L. 525, 528 (Sup. Ct. 1926), affirmed 104 N.J.L. 165 (E. & A. 1927); Princeton v. State Board of Taxes, 96 N.J.L. 334, 339 (Sup. Ct. 1921).
We conclude that the post-1953 changes in Rider College's development, function, management, and approach, when added to the alterations in its corporate structure, control, and operation following 1941, sufficiently tip the scales in favor of the correctness of the State Division's holding that Rider College during 1957 and 1958 was "not conducted for profit." The substantial factual evidence shows the positive existence of the factors to satisfy the tests outlined in The Kimberly School case, supra. This administrative finding, that the burden of proving the tax-exempt status for those years has been sustained, should be approached on review with a proper measure of judicial restraint. Passarella v. Board of Commissioners, 1 N.J. Super. 313, 321 (App. Div. 1949); City of Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959), certification denied 30 N.J. 153 (1959). If the finding is based upon substantial evidence, it ought not be disturbed. Sanders v. Director, Division of Taxation, 40 N.J. Super. 477, 483 (App. Div. 1956); Kresge-Newark v. City of Newark, 30 N.J. Super. 489 (App. Div. 1954). "In this court the presumption is that the determination of the Division of Tax Appeals is sound and the burden is on the party attacking it to overcome that presumption." City of Trenton v. John A. Roebling Sons Co., 24 N.J. Super. 213 (App. Div. 1953). We conclude that there is ample evidence to support the finding that Rider College was entitled to a tax-exempt status for 1957 and 1958 under N.J.S.A. 54:4-3.6.
*14 As Chief Justice Weintraub aptly commented in his recent opinion in Deubel v. Kervick, 33 N.J. 568 (1960):
"Exemptions from taxation are to be strictly construed, * * * but of course strict construction does not mean a construction which begrudges."
Accordingly, the determination of the State Division of Tax Appeals is affirmed. No costs.