21 A.3d 1166

INTERNATIONAL SCHOOLS SERVICES, INC., PLAINTIFF–
APPELLANT, v. WEST WINDSOR TOWNSHIP,
DEFENDANT–RESPONDENT.

Argued January 4, 2011—Decided July 6, 2011.

4

*Mark D. Schorr* argued the cause for appellant (*Crow & Associates,* attorneys).

*Michael J. Herbert* argued the cause for respondent (*Herbert, Van Ness, Cayci & Goodell,* attorneys; *Mr. Herbert* and *Rachel U. Doobrajh,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

In this local property tax appeal, we review a judgment that denied International Schools Services, Inc. (ISS) a tax exemption under *N.J.S.A.* 54:4–3.6. ISS challenged the 2002 and 2003 property tax assessments imposed on its office condominium units in West Windsor Township (Township), claiming it was entitled to exemption for property actually used in the work of a nonprofit corporation "organized exclusively for the moral and mental improvement of men, women and children." *N.J.S.A.* 54:4–3.6. For many years prior, the portion of the property owned and occupied by ISS had been exempted from local property taxation on that basis; ISS had not claimed an exemption for those portions that it did not occupy and that were dedicated to the operations of its related for-profit affiliates. However, in tax years 2002 and 2003, based on a review of ISS's recent activities, the Township denied the exemption for the ISS-occupied property.

ISS appealed, first to the Tax Court and thereafter to the Appellate Division. Both courts applied the statutory test for determining whether buildings used by associations and corporations organized for the moral and mental improvement of men, women and children are entitled to exemption from taxation, as that test has been explicated in *Paper Mill Playhouse v. Millburn Township,* 95 *N.J.* 503, 472 *A.*2d 517 (1984). Although their reasoning was not perfectly aligned, both courts reached a common determination: ISS had conducted itself in a manner that entangled its activities and operations on its property with the advancement of for-profit activities of other related and unrelated for-profit entities. That commingling of effort and entanglement of activities and operations by ISS and its for-profit affiliates was

found to be significant and it all flowed to the benefit of the for-profit entities. Thus, both courts concluded that because ISS allowed its property to be used for profit, it was not eligible for exemption during the tax years in issue.

In this appeal ISS claims that the judgment of the Appellate Division is in error for holding that its owned and occupied real property was not entitled to exempt status. It also requests clarification of the statutory test's application in these circumstances.

We granted ISS's petition for certification, *International Schools Services, Inc. v. West Windsor Township,* 203 *N.J.* 96, 999 *A.*2d 464 (2010), as much to settle the analysis that pertains in these circumstances as to review the holding against ISS. We now affirm the judgment of the Appellate Division.

I.

A.

The following description of the property and activities of ISS is drawn from the full and detailed record developed by the Tax Court in this matter.

The property whose status is the subject-matter of this appeal (Property) is located at 15 Roszel Road in West Windsor Township. ISS has owned and operated the Property, consisting of four office condominium units, since 1989, and has located its own central office at the Property since that time. During the years at issue, ISS employed approximately fifty people in its central office. It also leased portions of the space available at the Property to other organizations, including two organizations with which it was affiliated. For each year from 1990 through 2001, the Township granted ISS a property tax exemption, pursuant to *N.J.S.A.* 54:4-3.6, for the portions of the Property actually occupied by ISS. ISS paid property tax on those portions of the Property which were vacant or were leased to other tenants. On October 6, 2003, the

Township revoked ISS's property tax exemption for the tax years 2002 and 2003 and ISS filed suit.

## B.

ISS is organized as a nonprofit corporation and maintains a tax-exempt status under Section 501(c)(3) of the Internal Revenue Service (IRS) Code. *See* 26 *U.S.C.A.* § 501(c)(3). It was founded in 1955 by Arthur Sweetser, whose goal was to ensure that American children living overseas received a quality, American-style education.

Its Certificate of Incorporation explains in detail the purposes for which the company was organized:

> The purpose or purposes which the Corporation will hereafter pursue are: (1) to aid, promote and encourage, by all appropriate means, including gifts of money or other property, or by other means schools, facilities, and other organizations that are exclusively educational in character, (2) to foster the provision of education by the payment of salaries, fellowships and grants to teachers and instructors, and (3) to devote all or a part of the income and any or all of the principal of any property, real or personal, to the furtherance and support of projects and institutions that are exclusively educational; *provided,* however, that no part of the net earnings of such schools, facilities, projects, institutions and other organizations inures to the benefit of any private shareholder or individual, and *provided further,* (a) that no substantial part of the activities of such organizations is carrying on propaganda, or otherwise attempting, to influence legislation, and (b) that such organizations do not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

The ISS website, as of June 11, 2003, also set out a general purpose statement for the organization:

> The mission of [ISS] is to advance the quality of education for children in international schools by providing innovative *services and solutions* for learning communities and corporations throughout the world. This is accomplished by working with all groups that are involved in the education process.

As of 2002 and 2003, ISS served approximately 800 schools in as many as 185 countries around the world. Each school sought to provide an American-style education, with classes conducted in English. ISS assisted the institutions by selecting qualified American teachers and superintendents to serve as staff; procuring school supplies; providing the management operations necessary to the functioning of a typical American school; providing

financial management services; and making grants to individuals and schools to promote educational curricula. Cumulatively, the services encompassed the broad functions, both educational and administrative, performed by a local board of education. In addition to serving independent schools, ISS also had begun to own and manage its own international schools.

ISS provided the enumerated services based on the particular needs of the individual schools it was assisting. Its decisions were made irrespective of whether its engagement would result in net earnings or losses. ISS often priced its services at below-market rates, and would occasionally reduce those prices further when a school was unable to pay the full fee. Generally, its school management services were priced in consideration of a school's size, the risk attaching to the region where the school was located, and the difficulty of providing educational services in that region. ISS's personnel placement services were based on the size of the client school and its ability to pay. In 2002 and 2003, placement fees ranged from $2,900 to $7,500. For procurements of educational supplies, which schools obtained at a discount through ISS, ISS charged a minimum of $2,000.

In addition to its consulting work and direct provision of services, ISS published annually a "Directory of Schools," which detailed the educational programs of approximately 600 of the international schools with which it was engaged. The Directory's intended audience was parents who were looking for educational options while living abroad and educators who were deciding where they wanted to teach. ISS also published a quarterly newsletter designed to link schools, to allow schools to advertise for teachers, and to facilitate communication among teachers allowing them to share educational ideas. Advertisement space was sold in the publications, but the Directory and the newsletter were provided free to schools and teaching candidates.

Between 1998 and 2004, ISS operations ran at a net loss in all but one year; operational losses ranged from about $100,000 to more than $1.2 million. In 2001, the single year that operations

resulted in a surplus, the gain approximated $120,000. Looking beyond operations, ISS experienced a decrease in net assets for all but two of the years from 1998 to 2004. Although net assets increased approximately $75,000 in 2000 and $420,000 in 2001, in all other years ISS experienced losses between approximately $40,000 and $920,000. When ISS ran a surplus, it reinvested the money in its operations and/or placed the money in its reserves to ensure that the organization's operations would be able to continue in lean times. In 2002 and 2003, ISS's reserves ranged from $2.8 million to $3.1 million.

Should ISS dissolve, its assets would not be distributed to any individual. Instead, the Certificate stipulates that all assets must be distributed to a similar "charitable or educational" institution.

A twelve-person uncompensated Board of Directors governs ISS, while the daily management responsibilities are fulfilled by a professional staff. Compensation is limited by the Certificate of Incorporation to reasonable salaries for services actually performed. ISS's president, John Nicklas, has received a salary in accordance with the findings of a compensation survey that assessed the salaries of chief executive officers of similarly-sized nonprofits in New Jersey. Superintendents and other staff members of ISS also received salaries determined by way of comparison to those engaged in similar positions in similar locales.

## C.

ISS maintains interrelationships with a number of corporations of both nonprofit and for-profit status. The International Schools Foundation, Inc. (ISF) is incorporated in New Jersey and organized as a Section 501(c)(3) nonprofit. Established in August 1999, it has its own Board of Directors, one member of which is Nicklas, ISS's president. ISF is the sole shareholder and, therefore, the parent corporation of ISS. It was founded to coordinate between ISS and for-profit entities; its exclusive purpose is to ensure that ISS maintains its mission.

The first of the relevant for-profit entities whose connection with ISS requires examination is the Independent Schools Group, Inc. (ISG), a New Jersey for-profit corporation that was formed in August 1999. As with ISS, ISG operates under the umbrella of ISF, although the crucial difference is that ISG can engage in for-profit activities to fill needs left unmet by ISS, such as providing insurance and investment services to the educational community abroad.

When ISG was formed, ISF determined that ISS and ISG would have to maintain an "arms-length" relationship with each other. Nonetheless, ISS provided start-up funding for ISG and extended to ISG an unsecured line of credit. The initial credit agreement stipulated that ISS would provide up to $100,000 in operating capital, increasing to $300,000 at a point in late 2000 and to $400,000 in late 2003. All disbursements were to accrue interest at the rate of 8% until the start of 2000, at which point the interest rate would reset to prime plus one percent. Interest payments were to be due monthly, and the date of principal repayment was designated as January 2003. ISG made the interest payments on the credit account; however, ISS's financial statements for the fiscal year ending June 30, 2003 do not reveal that ISG made principal payments when they came due.

With respect to ISG's operations, the record reveals that in February 2000, ISG entered into an agreement with the financial services entity of Raymond James Financial Services (Raymond James), allowing that organization to service the international educational community on behalf of ISG. In November 2000, ISG leased 600 square feet of office space from ISS on the Property. The lease was for $500 per month, and included utilities, taxes, and insurance. ISG, however, would pay for its own business expenses, like phone, fax, cable, and email charges. The lease agreement appears to have given ISG use of the office space at below market rates. In August 2001, when its president was terminated, ISG stopped paying rent and ceased occupying the space. At that juncture, Raymond James, located in Virginia,

conducted all marketing of ISG's investment products. Therefore, prior to the tax years relevant to this appeal, the lease between ISS and ISG had concluded. Nonetheless, during the 2002–2003 time frame, Nicklas remained a member of ISG's Board and served briefly as its interim president; and in 2001 and 2002 ISS prepared ISG's tax forms, which were signed by Nicklas.

The second for-profit entity related to ISS that we examine in connection with this matter is ISS Financial and Insurance Network, Inc. (ISSFIN), a for-profit New Jersey corporation founded in May 2002 to offer insurance products to the educational community abroad. ISSFIN was a joint creation of ISG, which had a fifty-one percent interest, and Gables Financial Group, Inc. (Gables Financial), which had a forty-nine percent interest. Gables Financial is a diversified insurance and financial investment company based in Coral Gables, Florida. For the tax years at issue, Nicklas served as ISSFIN's Chairman of the Board. An April 14, 2003 press release, published jointly by ISS and Gables Financial, announced ISSFIN's creation:

> The ISS Financial and Insurance Network will serve the market with a full slate of insurance products and services for teachers and administrators, including medical, life, and disability products, as well as various business and liability coverages for the international schools. In addition, the ISS Financial and Insurance Network is currently marketing products for individual financial security through a strategic partnership with Raymond James Financial, and has entered negotiations for a strategic alliance to provide capitalization products for schools.

On June 23, 2003, another press release was issued:

> International Schools Service[s], Inc. (ISS) and Gables Financial Group, Inc. (GFG) today announced the formation of a financial and insurance services organization. The formal partnership will be known as the ISS Financial and Insurance Network (ISSFIN), and operations will be headquartered in Coral Gables, FL. In addition, ISSFIN will create a regional sales and marketing office at ISS headquarters' in Princeton, NJ.
>
> . . . .
>
> John M. Nicklas says, "Providing financial and insurance products is a natural extension of our original mission."

According to Nicklas, ISS sought strategic partners that would enhance the services available to international schools. He explained that schools often approached ISS for help when looking

for people and/or services not provided by ISS. Through ISG, ISS attempted to form partnerships that could fill such gaps. An ISS statement, posted on its website in January 2004, explained its vision for the options that should be available to international schools:

So the dawn of this 21st century finds ISS still serving its original mission, but expanding its role in service areas. The ISS Financial [and Insurance] Network ( [ISSFIN] ) provides money and asset management products that will be a valuable complement to the Foundation and payroll services ISS has offered schools since 1968. Schools will be able to build financial stability and fund new education programs through the aggregate benefits of these financial management services. [ISSFIN] will expand the range of insurance, investment opportunities, and retirement options for educators to assist them in creating satisfying and rewarding careers. The success of these educators and the stability they achieve personally and professionally as employees at international schools, will help them as they work shaping tomorrow's world leaders.

In May of 2003, ISSFIN leased from ISS 1,400 square feet of office space on the Property. The lease agreement stipulated that ISSFIN would pay $700 per month, and that the lease would last until either party gave sixty days notice. ISSFIN did not have to pay for utilities, taxes, or insurance, but was required to cover its phone, fax, cable, and email charges. In these proceedings, ISS's finance officer has conceded that ISSFIN's rent was in the range of one-third to one-quarter of what ISS could charge on the open market. While ISSFIN was paying a rate of $6 per square foot, all other tenants were paying between $20 and $23.10 per square foot. Moreover, ISSFIN was the only tenant that was not required to pay escalation charges for taxes, utilities, and insurance. ISSFIN had no net income in 2002 or 2003, and ISS prepared ISSFIN's income tax returns for 2002, which were signed by Nicklas.

## II.

This litigation stems from the Township's revocation of the tax exemption granted to ISS for the use of those portions of the Property that it actually occupied. ISS challenged that municipal determination in Tax Court. Based on the record initially developed on cross-motions for summary judgment, on November 19,

2004, the Tax Court granted the Township's motion and denied ISS's motion, finding that ISS had not satisfied the first prong of the *Paper Mill Playhouse* test, which requires that the entity seeking the tax exemption be "organized exclusively for the moral and mental improvement of men, women, and children." *Int'l Sch. Servs., Inc. v. W. Windsor Twp.*, 21 *N.J.Tax* 553, 568–69 (Tax 2004) (citing *Paper Mill Playhouse, supra,* 95 *N.J.* at 506, 472 *A.*2d 517).

ISS appealed, and the Appellate Division reversed. *Int'l Sch. Servs., Inc. v. W. Windsor Twp.*, 381 *N.J.Super.* 383, 886 *A.*2d 204 (App.Div.2005). The panel held that the corporate purpose of ISS, as evidenced by its organizing documents and related extrinsic evidence in the motion record, was to aid and promote educational organizations abroad, and that this purpose satisfied the first prong of the *Paper Mill Playhouse* analysis; accordingly, the panel reversed the Tax Court's grant of summary judgment to the Township. *Id.* at 388–89, 886 *A.*2d 204. It remanded to the Tax Court to determine whether the remaining prongs of the test were met. *Id.* at 389, 886 *A.*2d 204.

On remand, the Tax Court conducted a three-day trial and held that the second prong of the *Paper Mill Playhouse* test was unsatisfied, finding that the Property was not actually used for the tax-exempt purpose because it was "the schools that were performing those activities" that were actually engaged in the potentially tax-exempt activity, "and not ISS." *Int'l Sch. Servs., Inc. v. W. Windsor Twp.*, 24 *N.J.Tax* 453, 479 (Tax 2009). In the Tax Court's view of ISS's operations, the public purpose of educating American students and other foreign nationals abroad was not ISS's purpose; rather, ISS merely assisted schools that actually carried out the public purpose. *Id.* at 480.

Furthermore, the court found the third prong unmet because "ISS operated and maintained the subject property for the purpose of making a profit, as that requirement has been construed by the New Jersey courts." *Ibid.* The Tax Court focused on the below-market rates charged to the for-profit entities, ISG and

ISSFIN, with which ISS was affiliated; that ISS paid the utility, tax, and insurance charges stemming from the lease of its Property to its affiliates; that ISS provided to ISG an unsecured loan from its operational surplus; and that ISS allowed its name and reputation to be appropriated to promote profit-making ventures. *Id.* at 482–83. The court focused on the way that the funds and subsidies provided by ISS would accrue both to its for-profit affiliates as well as to Gables Financial, a for-profit entity whose funds would not be, in any conceivable set of circumstances, funneled back into supporting ISS and the ISS mission. *Ibid.*

ISS appealed again. The Appellate Division, although disagreeing with the Tax Court's finding in respect of prong two of the *Paper Mill Playhouse* test, affirmed the judgment denying the exemption because the panel agreed that ISS had acted in a way that allowed its Property to be used for forbidden for-profit endeavors. *Int'l Sch. Servs., Inc. v. W. Windsor Twp.*, 412 *N.J.Super.* 511, 524–27, 530, 991 *A.*2d 848 (App.Div.2010). The Appellate Division concurred that the various subsidies provided to ISG, ISSFIN, and Gables Financial (through its ownership interest in ISSFIN), made ISS ineligible for a property tax exemption. *Id.* at 530, 991 *A.*2d 848. Those activities evidenced that ISS had engaged in conduct that used its Property for profit, and thus failed to meet the third prong of the *Paper Mill Playhouse* test. *Id.* at 529, 472 *A.*2d 517.

## III.

*N.J.S.A.* 54:4–3.6 governs the disposition of this case. It provides in pertinent part:

The following property shall be exempt from taxation under this chapter: ... all buildings actually used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, provided that if any portion of a building used for that purpose is leased to profit-making organizations or is otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt; ... provided, in case of [ ] the foregoing, the buildings, or the lands on which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit[.]

■ It is a fundamental legal tenet that a statute granting exemption from property taxation, such as *N.J.S.A.* 54:4–3.6, is subject to strict construction and, further, that the party seeking exemption under its terms bears the burden of proving that the bases for it have been established. *See Princeton Univ. Press v. Borough of Princeton,* 35 *N.J.* 209, 214, 172 *A.*2d 420 (1961); *see also Hunterdon Med. Ctr. v. Twp. of Readington,* 195 *N.J.* 549, 569, 951 *A.*2d 931 (2008) (explaining that tax exemptions should be strictly construed against claimants to extent consistent with legislative intent). The underlying reason is grounded in the public policy that taxation statutes reflect: the public tax burden is to be borne fairly and equitably, as this Court has explained.

> The fundamental approach of our [tax] statutes is that ordinarily all property shall bear its just and equal share of the public burden of taxation.... Statutes granting exemption from taxation represent a departure and consequently they are most strongly construed against those claiming exemption.

> [*Princeton Univ. Press, supra,* 35 *N.J.* at 214, 172 *A.*2d 420.]

*See also N.J. Const.,* art. VIII, § 1, ¶¶ 1(a), 2. Those principles, reiterated not long ago by this Court, promote the goal of uniformity in taxation and eliminate the harm that comes from "unauthorized exemptions from local property taxation [which] can unduly burden particular communities." *Twp. of Holmdel v. N.J. Highway Auth.,* 190 *N.J.* 74, 99, 918 *A.*2d 603 (2007).

The specific policy embodied in the tax exemption at issue here has been in existence for almost a century. *See Paper Mill Playhouse, supra,* 95 *N.J.* at 506, 472 *A.*2d 517 ("Since 1913, New Jersey's policy has been to exempt from local property taxes property actually and exclusively used by nonprofit corporations for the moral and mental improvement of men, women and children."). For most of that time, the specific exemption from taxation for such purposes was "tested by exclusiveness both of purpose of the organization and of use of the property for the moral and mental improvement of men, women and children." *Princeton Univ. Press, supra,* 35 *N.J.* at 214, 172 *A.*2d 420 (citations omitted); *id.* at 216–17, 172 *A.*2d 420 (applying "exclu-

sively used" requirement and finding profit-making endeavor to be substantial and permanent, and disqualifying in nature).

The statute still contained those required components for the exemption when examined in the seminal case of *Paper Mill Playhouse*. In that appeal, this Court delineated three criteria that an association or corporation promoting the moral and mental improvement of adults or children must satisfy in order to come within the exemption provided by *N.J.S.A.* 54:4–3.6:

(1) it must be organized exclusively for the moral and mental improvement of men, women and children;

(2) its property must be actually and exclusively used for the tax-exempt purpose; and

(3) its operation and use of its property must not be conducted for profit.

[*Paper Mill Playhouse, supra,* 95 *N.J.* at 506, 472 *A.2d* 517.]

That iteration of the test has become the standard for determining whether an entity organized for the moral and mental improvement of men, women and children is entitled to exemption under *N.J.S.A.* 54:4–3.6. *See, e.g., N.J. Ass'n of Sch. Bus. Officials, Inc. v. Hamilton Twp.,* 22 *N.J.Tax* 467, 478–79 (Tax 2005); *Cmty. Access Unlimited, Inc. v. City of Elizabeth,* 21 *N.J.Tax* 604, 610 (Tax 2003); *Black United Fund of N.J., Inc. v. City of E. Orange,* 17 *N.J.Tax* 446, 454–55 (Tax 1998). That said, the test as enunciated in *Paper Mill Playhouse* has been altered by legislative action subsequent to that decision. Legislative amendment to *N.J.S.A.* 54:4–3.6 has eliminated the second prong's exclusivity requirement. *See L.* 1985, *c.* 395. The statute presently permits exemption for property that is "actually used" in connection with tax-exempt functions, instead of imposing the exemption's requirements on "all buildings actually *and exclusively* used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children[.]" *Compare L.* 1985, *c.* 395, *with L.* 1983, *c.* 224 (emphasis added). As explained in the Governor's reconsideration and recommendation statement to Assembly No. 2246, which resulted in the successful passage of the amendatory *L.* 1985, *c.* 395, the purpose of the amendment was

to allow associations for the moral and mental improvement of men, women and children to receive a partial real property tax exemption for buildings partially used for their own charitable purposes and partially used for non-exempt purposes or leased to profit-making tenants. Under current law, each separately assessed structure must be exclusively used for exempt purposes for the exemption to apply. This bill would allow an exemption to apply to that portion of any building actually used in connection with tax-exempt functions. Similar treatment has been provided for hospitals (*P.L.* 1983, *c.* 224) and educational institutions (*P.L.* 1977, *c.* 370).

Thus, when courts apply the test for the exemption as articulated in the *Paper Mill Playhouse,* it must be adjusted to accommodate the current language of the statute, as was done by the Tax Court and the appellate panel in this matter. *Int'l Sch. Servs., supra,* 412 *N.J.Super.* at 529, 991 *A.*2d 848 (acknowledging that Tax Court properly applied *Paper Mill Playhouse* test to reflect legislative modification of *N.J.S.A.* 54:4-3.6); *Int'l Sch. Servs., supra,* 24 *N.J.Tax* at 480–81 (recognizing that "*N.J.S.A.* 54:4–3.6 was subsequently amended, *L.* 1985, *c.* 395, and now requires only that the property be actually used for the exempt purpose" rather than "exclusively for the exempt purpose").

With the present iteration of the statutory test as the backdrop, we turn to the particular circumstances of this case.

## IV.

### A.

In this matter, the Appellate Division focused on the third prong and whether ISS's "operation and use of" its Property has or has not been "conducted for profit." Although we also must address that prong, in our review of the judgment on appeal we do not exclude from consideration the entire statutory test, with its interwoven parts. In our view, prong two and prong three must be addressed in tandem, as explained *infra* Part IV.C.

As with any case that turns on statutory construction, our task here "is to determine and effectuate the Legislature's intent." *In re Petition for Referendum on Trenton Ordinance 09–02,* 201 *N.J.* 349, 358, 990 *A.*2d 1109 (2010) (quotation marks and citation

omitted). In fulfilling that task, we are not bound to interpretations offered by the parties or set out by the court whose judgment we review; rather, we are bound only to apply faithfully the words of the Legislature to carry out its intent. Here, because we have not limited our jurisdiction in this appeal to an enumerated issue or issues,[1] and because there are no material issues of fact in dispute, we interpret and apply the statute as is necessary to the proper disposition of the case. *See State Farm Mut. Auto. Ins. Co. v. Zurich Am. Ins. Co.*, 62 *N.J.* 155, 164–65, 299 *A.*2d 704 (1973).

### B.

This Court has addressed the for-profit prong on a number of occasions and all under the prior iteration of the statute governing the exemption for organizations devoted to the moral and mental development of men, women and children. In each, the decision undertook to assess whether the particular entity was profiting from the manner in which the claimant utilized its buildings and property.

In *Paper Mill Playhouse, supra,* the Playhouse was found to satisfy the criterion for prong three in the way it ran its theater. 95 *N.J.* at 524, 472 *A.*2d 517. The Paper Mill Playhouse was a 501(c)(3) organization governed by an uncompensated Board of Trustees. *Id.* at 507, 511, 472 *A.*2d 517. The professional staff, headed by an executive producer, decided which productions would be staged at the Playhouse. *Id.* at 508, 472 *A.*2d 517. Those decisions were made without a consideration of profit, and financially unsuccessful shows were not closed early to make way for more profitable productions. *Ibid.* Paper Mill Playhouse aimed to set its ticket prices as close to cost as possible, resulting

---

[1] When certification is granted by unqualified order, the whole of the judgment below is brought into the scope of review. *R.* 2:12–11 ("If certification is granted, ... the petitioner's entire case shall be before the Supreme Court for review unless the Supreme Court otherwise orders[.]"); *State Farm Mut. Auto. Ins. Co. v. Zurich Am. Ins. Co.*, 62 *N.J.* 155, 164–65, 299 *A.*2d 704 (1973).

in prices that were about half of those charged by commercial theaters in New York City. *Id.* at 508–09, 472 *A.*2d 517. The Playhouse offered discounted prices to students and seniors, and provided free tickets to charitable organizations. *Id.* at 509–10, 472 *A.*2d 517. Paper Mill Playhouse also pursued a program in conjunction with local school districts, allowing students to see dramatic productions during school hours. *Id.* at 509, 472 *A.*2d 517.

Approximately ninety-four percent of the theater's income came from ticket sales. *Id.* at 510, 472 *A.*2d 517. Revenue also was generated by the Playhouse's maintenance of a parking lot and refreshment concession, its sale of advertising in its programs, and its operation of a small art gallery in the theater's upper lobby. *Ibid.* Although the theater's productions often operated at a loss, many of the ancillary operations consistently yielded a profit. *See id.* at 510–11, 472 *A.*2d 517 (chart detailing profit and loss from various operations). Paper Mill Playhouse also received significant individual and corporate contributions. *Id.* at 511, 472 *A.*2d 517. The record in the case revealed that the Playhouse had accumulated a substantial and growing surplus of several hundreds of thousands of dollars. *Ibid.* Income and surplus was utilized to improve the theater, and the Playhouse had begun construction of a theater addition that would cost approximately $600,000. *Ibid.* The organization's Certificate of Incorporation prohibited its assets from inuring to the benefit of any individual, and upon dissolution, any assets would be turned over to a similar charitable organization. *Ibid.*

This Court held that even though Paper Mill Playhouse "at times realize[d] a profit and generate[d] a surplus," it could not be considered a "commercial enterprise." *Id.* at 520–21, 472 *A.*2d 517. The Court emphasized that, importantly, "profitability is not a consideration in determining which shows to produce, . . . a *production is never closed* . . . because it is losing money . . . [and w]hatever surplus exists is reinvested in theatrical productions, maintenance of the theater, or necessary capital improvement[.]"

*Id.* at 521, 472 *A.*2d 517. Rather than looking only to an entity's net income, we directed that a court should engage in "a realistic common sense analysis of the actual operation of the taxpayer; mechanical centering on income and expense figures is to be avoided." *Ibid.* A "crucial factor is where the profit goes. . . . If we can trace it into someone's personal pocket . . . the [entity] is not entitled to tax exemption." *Id.* at 522, 472 *A.*2d 517 (internal quotation marks omitted) (quoting *Trenton v. N.J. Div. of Tax Appeals,* 65 *N.J.Super.* 1, 12, 166 *A.*2d 777 (App.Div.1960)). Paper Mill Playhouse did not pay excessive salaries, and in the event of dissolution, none of its surplus would flow into a private citizen's pocket. *Id.* at 522–23, 472 *A.*2d 517. Ultimately, we determined that the Playhouse had met all three criteria set out in *N.J.S.A.* 54:4–3.6, and was entitled to an exemption from property tax. *Id.* at 524, 472 *A.*2d 517.

In addition to *Paper Mill Playhouse,* which dealt with the question of whether a theater's "operation and use of its property [was] conducted for profit," *id.* at 506, 472 *A.*2d 517, two older cases also shed light on the instant appeal. *Princeton University Press, supra,* 35 *N.J.* 209, 172 *A.*2d 420 (1961), dealt with the activities conducted at a university press that was argued to be operating for the moral and mental improvement of men, women and children, and *Kimberley School v. Town of Montclair,* 2 *N.J.* 28, 65 *A.*2d 500 (1949), concerned the operations of a school seeking exempt status under a similar exemption for educational institutions, which contained the same third prong requirement as that here.

In the latter case, the Kimberley School was a private day school whose Certificate of Incorporation stated that no profit could inure to any individual, and that the assets would be turned into a trust fund for educational purposes in the event of a dissolution. *Kimberley Sch., supra,* 2 *N.J.* at 30, 65 *A.*2d 500. For the school year in question, income exceeded expenditures. *Id.* at 31–32, 65 *A.*2d 500. Teachers received modest salaries, and

students paid tuition that was comparable to other schools in the area. *Id.* at 32, 65 *A.*2d 500.

In considering whether the school's operation of its property was being conducted for a profit, this Court explained that the entity "seeking exemption must be examined in the light of its past and present scheme of operation ..., due regard being had not so much for the question of whether its income exceeds the cost of operation in any particular year or years, but rather whether charges are fixed with the obvious intention of yielding a profit." *Id.* at 37, 65 *A.*2d 500. A holistic inquiry should focus on a number of factors, including:

> the background and nature of the organization of the school; the character and nature of the membership of its board of trustees or other governing body, particularly where former private owners are there represented; the amount of its income as compared with the costs of its operation; the amount of any excess of income over costs, and the actual and possible use of such excess; the existence and extent of its accumulated surplus and the purpose to which it may be put; and the amount of tuition charges as compared with those of similar schools; the scale of salaries paid to its teachers and officials as compared with similar schools, public as well as private; and the many other factors bearing upon the ascertainment of the dominant motive in the conduct of the school which need not now be detailed.
>
> [*Id.* at 38, 65 *A.*2d 500.]

Distinguishing cases where a school's owners or staff were able to draw substantial financial remuneration, *id.* at 38–40, 65 *A.*2d 500, we held that the Kimberley School had not been conducted for profit. *Id.* at 43, 65 *A.*2d 500. "[I]t can hardly be said that profit was the dominating object of" the owners who drew modest salaries. *Ibid.* Furthermore, the meager monetary reserves held by the school, after more than three decades of operation, were determined to be highly probative. *Ibid.* We noted that a school should not have to operate at a loss to receive exemption from property taxes. *Id.* at 44, 65 *A.*2d 500. Ultimately, this Court held that there was "nothing in the operation of Kimberley School which runs contrary either to the intent of the statute or to its underlying policy to grant exemption from taxation to educational institutions where they are not run for the purpose of making a profit." *Ibid.*

Turning lastly to *Princeton University Press, supra*, the Press was run by a Board of Trustees consisting of University trustees, alumni, and faculty. 35 *N.J.* at 211, 172 *A.*2d 420. The Press enjoyed a close relationship with the University. *Id.* at 212, 172 *A.*2d 420. Its Certificate of Incorporation stated that the Press had to "serve the University," *id.* at 211, 172 *A.*2d 420, and the members of the Editorial Board of the Press, charged with deciding what to publish, all had to be University faculty. *Id.* at 212, 172 *A.*2d 420.

The Press engaged in publishing scholarly works, as well as more routine printing work for the University and for unaffiliated entities. *Id.* at 212, 172 *A.*2d 420. The scholarly publishing often operated at a loss, but the general printing, accounting for forty-five percent of sales, operated at a profit most years. *Id.* at 213, 172 *A.*2d 420. This Court found that the routine printing work "is undertaken for the purpose of making a profit." *Id.* at 216, 172 *A.*2d 420. Because that work made up such a "substantial portion of the Press's activity," we looked to what became the pre-amended second prong of the *Paper Mill Playhouse* test, and determined that "it cannot be said that the property is *exclusively used* for the statutory purpose." *Ibid.*

As each of the aforementioned cases demonstrates, a proper application of the statutory test necessarily depends on the facts of each case. Thus, the cases are helpful to a limited degree but are not controlling. They differ in kind, factually, from the statute's application in the instant matter because all three focused on whether the exempt entity had engaged in forbidden profit-making activity *for itself.* Thus, the foregoing cases provide necessary background and assistance as we seek to apply appropriately prong three, in light of the alteration to prong two, in order to fulfill the legislative intent underlying the statutory change. But, we do so in the factual context of an entanglement of purposes to which the nonprofit's property and assets have been designated.

## C.

The Legislature amended *N.J.S.A.* 54:4–3.6 to eliminate the *exclusivity-of-use requirement* for buildings and property of associations and corporations organized exclusively for the mental and moral improvement of men, women and children. *L.* 1985, *c.* 395. On a purely facial level, that change means that property of a nonprofit exempt-entitled entity can be used for non-exempt purposes so long as the two purposes can be separately stated and accounted for and so long as the non-exempt use is never subject to the property tax exemption. The question in this case is whether the Legislature's elimination of the exclusivity requirement would allow a nonprofit entity to conduct for-profit activities in a commingled fashion on its owned and occupied property, and not just to support for-profit activities of the entity but also to support the for-profit activities of others.

We doubt that the Legislature ever envisioned that result. Our reading of the statutory amendment and its legislative history persuades us that the Legislature never intended to allow a nonprofit entity to avail itself of the benefits of the non-exclusivity clause of prong two and engage in for-profit activities that are not conducted so as to be evident, readily ascertainable, and separately accountable for taxing purposes. Rather, the legislative change that permitted some for-profit activity to take place in an exempt entity's building or on its property presumes an ability to identify it, segregate it, and measure it for local taxing purposes. That way, the public taxation policy is advanced and all property, except that specifically exempted by law, will bear its fair share of the tax burden. Otherwise, to permit a nonprofit entity to claim a property tax exemption when it has become inseparably entangled with for-profit entities would allow indirect taxpayer subsidization of those entities. In other words, a competitive advantage would be conferred on those for-profit entities at the expense of the taxpaying public. The advantage would accrue to the monetary gain of the stockholders and owners of the for-profit entity, and would result in the type of disquieting outcome cautioned against in

*Paper Mill Playhouse, supra,* in which we warned that an exemption should not be granted when profit can be traced "into someone's personal pocket." 95 *N.J.* at 522, 472 *A.*2d 517.

It bears repeating that in the context of tax exemptions, the burden is on the claimant to establish the right to the exemption. *See Princeton Univ. Press, supra,* 35 *N.J.* at 214, 172 *A.*2d 420; *Jamouneau v. Div. of Tax Appeals,* 2 *N.J.* 325, 330, 66 *A.*2d 534 (1949). And therefore the claimant has the corollary duty to conduct its affairs in such a fashion as to allow local taxing authorities to readily determine its eligibility for exemption. Here the inability to discern between the nonprofit activities on ISS's owned and occupied Property and its activities in that same location that were in furtherance of the interests of various for-profit entities is the fault of the taxpayer claimant. No governmental entity is responsible for directing ISS to commingle its financing and operations with ISSFIN and ISG, where the for-profit benefits are flowing from ISS to related (and unrelated) for-profit entities.[2] It was the taxpayer entity itself that constructed this quagmire of entanglement, properly identified by the Tax Court and the Appellate Division panel whose judgment we review. We give their factual findings, on which we base our conclusions, considerable deference in light of the Tax Court's special expertise. *See Hunterdon Med. Ctr., supra,* 195 *N.J.* at 573, 951 *A.*2d 931 (recognizing deferential approach to Tax Court's findings in light of "expertise and experience" of Tax Court judges); *Glenpointe Assocs. v. Twp. of Teaneck,* 241 *N.J.Super.* 37, 46, 574 *A.*2d 459 (App.Div.) (noting that Tax Court judges "have special expertise" entitling their findings to deference), *certif. denied,* 122 *N.J.* 391, 585 *A.*2d 392 (1990). The Appellate

---

[2] Thus, this situation is unlike those in *Paper Mill Playhouse* and *Kimberley School* where some of an individual claimant's own endeavors were producing a profit for the claimant itself. Here the claimant's activities in its operational headquarters are supporting the profitable activities of separate for-profit entities.

Division succinctly summarized the various forms of subsidies that the Tax Court found ISS was providing to for-profit affiliates:

The [Tax Court] judge had ample basis in the record to conclude that a portion of ISS' profit was being used to subsidize the operations of its profit-making affiliates through the provision of professional services that were not "charged back," below-market rents, and unsecured loans that do not appear to have been timely repaid. In addition, although ISS has an educational mission, it has lent its name and reputation to promote joint profit-making ventures, as evidenced, in part, by its creation of ISG and ISSFIN, which operate out of the same building as ISS and share officers and staff; the wording of the ISSFIN press release; and the expanded mission statement on ISS' website promoting "ISSFIN['s] . . . money and asset management products."

[*Int'l Sch. Servs.*, *supra*, 412 *N.J.Super.* at 530, 991 *A.2d* 848; *see also Int'l Sch. Servs.*, *supra*, 24 *N.J.Tax* at 482–83 (detailing ISS's subsidies to for-profit affiliates).]

Based on that record, we hold that the commingling of effort and entanglement of activities and operations by ISS and its profit-making affiliates was significant and it was substantial. And, all of the benefit in the form of direct and indirect subsidies flowed one way: from the exemption claimant ISS to the for-profit entities. We further hold that the Appellate Division reached the proper conclusion in affirming the denial of the tax exemption to ISS for tax years 2002 and 2003 on this set of facts.

## V.

The judgment of the Appellate Division is affirmed.

Justice RIVERA–SOTO, dissenting.

Although the legal analysis advanced by the majority as governing the question on appeal is unquestionably correct, I must respectfully disagree with the conclusions the majority reaches.

The majority concludes that "the commingling of effort and entanglement of activities and operations by [plaintiff International School Services, Inc. (ISS) ] and its profit-making affiliates was significant and it was substantial." *Ante* at 25, 21 *A.*3d at 1179. It further claims that "all of the benefit in the form of direct and indirect subsidies flowed one way: from the exemption claimant

ISS to the for-profit entities." *Id.* at 25, 21 *A.*3d at 1179. In my view, the limited findings in this record do not support those conclusions.

The relevant template used to contrast and compare between commingled for-profit as opposed to not-for-profit activities is set forth in *Paper Mill Playhouse v. Millburn Township,* 95 *N.J.* 503, 510–11, 472 *A.*2d 517 (1984), where the various profits/losses for the non-for-profit's commingled activities are presented graphically. That device provides an accurate analytical tool that allows for an informed decision on this topic; then, and only then, may a reasoned and informed conclusion be reached as to whether the claimed commingling is substantial or merely de minimus. Yet, a graph of that type—or, for that matter, any objective, quantifiable comparison between for-profit and not-for-profit activities—is glaringly missing from the majority's consideration. Despite that absence, the majority nevertheless concludes that the commingling here, whatever it may have been, "was significant and it was substantial[;]" that unsupported conclusion wrongfully results in the needlessly broad denial of the entirety of ISS's property tax exemption on *all* of its realty, and not just on that portion of the realty used for profit-making purposes. *See N.J.S.A.* 54:4–3.6 (providing that "if any portion of a building used for that purpose is leased to profit-making organizations or is otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt").

The want of quantifiable "hard" data as to the extent of the commingling between ISS and its for-profit affiliates renders it, at the very least, premature to pronounce that the mere fact of commingling dooms the real estate tax exempt status of an otherwise obviously deserving entity. And, in that context, innuendo that ISS's "investments" in those for-profit affiliates—either by the provision of a line of credit that no one has demonstrated was financially unsound, the allowance of below-market rent to a start-up affiliate also serving ISS's core constituency in an area ISS does not reach, or by the provision of the services of its

executives that no one has shown to have been to the detriment of ISS—is precisely that: innuendo, a poor and wholly inadequate substitute for adequate proofs.

Distilled to its essence, the majority's conclusion is based on three unquantified facts: that ISS provided a line of credit to its for-profit affiliates; that ISS rented space to those for-profit affiliates at a below-market rate; and that ISS executives also served functions for the for-profit affiliates. In the majority's view, those facts provide the level of commingling needed to void a real estate tax exemption. But, without more, those bare facts alone cannot sustain the majority's conclusions. No doubt, if, instead of providing an interest-bearing credit line to an affiliate, ISS had invested its funds with a commercial bank and secured a rate of return therefrom, would anyone claim that ISS's tax-exempt status was at risk simply because it had engaged in a profit-making endeavor by prudently investing its funds? Like-wise, if, instead of providing services to an ISS affiliate, ISS's officers and directors on their own time had engaged in for-profit activities, would anyone dare claim that ISS should thereby lose its real estate tax exemption? Finally, the notion of providing below-market rent to a start-up—whether affiliated or not—is a commonplace in our economy, and a beneficial one at that; it is by no means nearly as nefarious as the majority would have it.

In the final analysis, the relevant difference for real estate tax exemption purposes lies not in the *fact* of the commingling—which is undisputed here—but in the *quantum* of that commingling. Because no real effort has been made to place the amount and extent of that commingling in a meaningful and proper context, I see no reason to deny this otherwise worthy charitable institution the entirety of the real estate tax exemption our laws, as a matter of legislative and public policy grace, allow. I, therefore, respect-fully dissent.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, and HOENS—5.

*For reversal*—Justice RIVERA–SOTO—1.