990 A.2d 1109

IN RE PETITION FOR REFERENDUM ON CITY
OF TRENTON ORDINANCE 09–02.

Argued March 22, 2010—Decided April 6, 2010.

Rabner, C.J., dissented and filed opinion.

————

*George T. Dougherty* argued the cause for appellant Committee of Petitioners (*Katz & Dougherty*, attorneys).

*William W. Northgrave* argued the cause for respondent City of Trenton (*McManimon & Scotland*, attorneys; *Mr. Northgrave, Edward J. McManimon, III*, and *Jaime R. Placek*, on the brief).

*Ira G. Megdal* argued the cause for intervenor-respondent New Jersey–American Water Company (*Cozen O'Connor*, attorneys; *Mr. Megdal and Douglas W. Frankenthaler*, on the brief).

*Joseph L. Mooney, III*, submitted a brief on behalf of amicus curiae Food & Water Watch, Inc. (*Mr. Mooney*, attorney; *Mr. Mooney* and *Zachary B. Corrigan* a member of the District of Columbia bar, on the brief).

PER CURIAM.

"The Legislature has conferred on the voters of Faulkner Act[1] municipalities, such as Trenton, 'the power of referendum,' the right to test a challenged ordinance in the crucible of the demo-

---

[1] The Faulkner Act is also known as the Optional Municipal Charter Law. *N.J.S.A.* 40:69A–1.

cratic process." *In re Referendum Petition to Repeal Ordinance 04–75*, 192 *N.J.* 446, 450, 931 *A.2d* 595 (2007) (citing *N.J.S.A.* 40:69A–185) (footnote omitted). The referendum power is one of the key provisions of the Faulkner Act. It is an exercise in democracy that profoundly affects the relationship between the citizens and their government by affording the people the last word if they choose to take a stand against the wisdom of an ordinance that the government has enacted. Thus, "[w]hen a referendum petition is properly filed, the voters have the final say in approving or rejecting an ordinance at the ballot box." *Ibid.*

This case involves the interplay between the Faulkner Act, *N.J.S.A.* 40:69A–185, and the Municipal Utilities Law (MUL), *N.J.S.A.* 40:62–1 to –151. In particular, the question presented is whether *N.J.S.A.* 40:62–3.1, which governs the sale of a municipal water utility, was intended to strip the public of the power to challenge an ordinance by referendum afforded by *N.J.S.A.* 40:69A–185. Because there is no clear evidence of such an intention on the part of the Legislature, Ordinance 09–02 of the City of Trenton, which authorizes the sale of a municipal water utility system to a private entity, is subject to referendum under the Faulkner Act.

## I.

The City of Trenton (the City), a Faulkner Act municipality organized under a mayor-council form of government, *see N.J.S.A.* 40:69A–32, controls a water distribution system, the Trenton Water Works (TWW). The TWW consists of two parts: the Inside Water Utility System (IWUS), which serves residents and businesses within the City, and the Outside Water Utility System (OWUS), which serves residents and businesses in the townships of Ewing, Hamilton, Hopewell and Lawrence. The TWW is a revenue-generating operation providing the City with over forty million dollars per year, about sixty percent of which comes from the OWUS.

In 2000 and 2005, the City commissioned two outside consulting firms to prepare reports to determine whether OWUS could be separated from IWUS. The firms concluded that separating the two water utility systems would serve the interests, public health and safety of both Trenton and the townships served by OWUS.

In 2007 the City negotiated a contract for the sale of OWUS to New Jersey–American Water Company (NJAW), a shareholder-owned water utility. The City submitted a petition to the Board of Public Utilities (BPU) pursuant to section 3.1 of the MUL, which provides that if the government deems it advisable to transfer a water utility system serving less than five percent of its population to another entity, the transfer may be authorized by ordinance subject to review by the BPU. *N.J.S.A.* 40:62–3.1.

Among the reasons advanced for the sale were: that the City would be relieved of operating and maintaining a water system that does not serve its residents; the proceeds of the sale would enable the City to pay down water system and other City debt; the sale would provide the City with the ability to finance needed infrastructure improvements and stabilize real estate taxes, thus encouraging economic revitalization; the City would continue to receive IWUS revenues; and residents and customers of OWUS would be better served if it was run by a qualified utility operator.

Several organizations, including the townships serviced by OWUS, intervened; consequently, the BPU referred the matter to the Office of Administrative Law (OAL), which conducted a public hearing. At that proceeding, the parties agreed on amendments to the contract, and the matter was referred back to the BPU for review.

On February 3, 2009, the Trenton City Council adopted Ordinance 09–02, which authorized the sale of OWUS to NJAW. The mayor approved the sale. An administrative law judge (ALJ) subsequently found that the agreement was acceptable and recommended that the decision be adopted by the BPU. Shortly thereafter, a group of Trenton citizens (the citizens) filed a petition for referendum pursuant to the Faulkner Act, *N.J.S.A.* 40:69A–

185. According to the citizens, they opposed the sale because "it is a bad business arrangement, transforming the TWW from its current profile as a successful and profitable enterprise yielding healthy and vitally needed surpluses for the benefit of all users, to a state of virtual insolvency." Further, the citizens questioned the wisdom of selling a revenue-generating asset to fill an operating budget gap. The City countered with a Superior Court complaint seeking that the petition be declared null and void. NJAW moved to intervene.

The inquiry in the Law Division focused on whether section 3.1 supersedes the Faulkner Act; whether OWUS served more than five percent of the City's population; and whether OWUS and IWUS constitute a single system or two separate systems. The trial judge found in favor of the City and NJAW, concluding that the Legislature had opted to limit the power of the Faulkner Act when it enacted section 3.1 of the MUL. The judge concluded that IWUS and OWUS are separate entities, not two portions of the same system, and that dividing them would therefore not cause harm.[2]

The BPU then issued an order adopting the initial decision of the ALJ and incorporating the amendments to the contract agreed upon at the public hearing. The BPU considered, as required by statute, "the impact of the acquisition on competition, on the rates of ratepayers affected by the acquisition of control, on the employees of the affected public utility or utilities, and on the provision of safe and adequate utility service at just and reasonable rates." *N.J.S.A.* 48:2–51.1(a). Ultimately, the BPU adopted the proposed findings of the parties:

> The proposed acquisition will not adversely affect competition because there is no traditional competition within the water utility industry.
>
> Customers within the OWUS will receive an immediate rate decrease. Existing NJAW customers will not see any immediate rate increase as a result of the acquisition. Purchased water costs under the Water Supply Agreement, which will

---

[2] The factual findings of the judge have not been challenged before us and thus need not be detailed here.

initially be lower under the amended WSA, will be recovered in base rates beginning with NJAW's next base rate case. Over the long run, the approximately 40,000 additional OWUS costumers will contribute to the recovery of fixed costs—thus benefiting all NJAW customers.

There will be no adverse impact on employees of NJAW. As a result of the proposed acquisition, the management of NJAW will not change. Nor will there be changes to any day-to-day operations of NJAW as a result of the proposed acquisition. No workforce reductions are anticipated. In fact, the parties to the Stipulation claim that NJAW will add additional employees to serve the OWUS. The proposed acquisition will not affect existing collective bargaining agreements currently entered into by NJAW.

The proposed acquisition will not have an adverse impact on the continued provision of safe, adequate and proper service at just and reasonable rates in fulfillment of their obligations under New Jersey law. As a result of the proposed acquisition, NJAW will continue to adhere to its tariffs and to honor its customer and regulatory obligations. All service company agreements approved by the Board will remain in effect.

The BPU also found the following positive benefits:

NJAW will add additional employees to serve the OWUS. Furthermore, NJAW will establish a new local operating location within the OWUS service area, creating additional local employment opportunities.

Change in ownership of the OWUS system will allow NJAW to enhance existing emergency interconnections to address regional and local water supply needs during emergency events. In addition, the financial resources and backing of NJAW and its affiliates will be a benefit to the existing OWUS customers in the ongoing maintenance and renewal of infrastructure and continued compliance with the Water Act, 42 *U.S.C.* § 300, et seq. The customers of OWUS will benefit from becoming part of the largest regulated water utility in the United States. The customers of OWUS will receive the benefits of water industry standard best practices in areas such as planning, research, environmental compliance, water quality, finance, risk management, operations and service delivery and management.

The State of New Jersey will receive additional gross receipts and franchise taxes from NJAW that it would not otherwise receive if the acquisition were not to be completed.

Private capital will be invested in infrastructure in the OWUS.

The BPU further found that its decision was authorized by section 3.1 of the MUL and that OWUS could be considered a separate public utility once it was separated from IWUS.

The citizens then moved before the trial judge for reconsideration, alleging that OWUS and IWUS comprise a single water utility system, thus serving more than five percent of the populace. The judge agreed to reconsider and ordered the parties to

gather additional evidence on the issue of what percentage of Trenton was served by OWUS. Ultimately, the judge reinstated her original holding that OWUS served less than five percent of Trenton's population and rejected the citizens' argument that section 3.1 of the MUL intended for BPU approval to be in addition to, rather than instead of, approval by referendum.

The Appellate Division affirmed, upholding the trial judge's conclusion that the sale of OWUS was subject to the exception under MUL section 3.1, and declaring that the judge's factual determinations were supported by the record. In addition, the panel held that the alternative process set forth in section 3.1 was intended to supersede the general provisions of the Faulkner Act. The citizens filed a petition for certification limited to the legal issue of whether section 3.1 of the MUL negates the public's right to referendum under the Faulkner Act. We granted that petition. —— *N.J.* ——, —— *A.2d* —— (2010).

## II.

The parties reiterate the arguments they advanced below. The citizens dispute the Appellate Division's determination that BPU review was an intended substitute for voter referendum, contending that section 3.1 does not foreclose the right to referendum provided by the Faulkner Act. Further, they maintain that BPU review was intended to expand public participation, noting that all utility customers had the opportunity to voice their concern before the BPU, whereas the referendum process is limited to registered voters.

The City counters that the specific statutory exemption in section 3.1 to the referendum process preempts the application of the general provisions of the Faulkner Act. It further maintains that no inference is necessary regarding legislative intent because the language of the MUL is "clear and unequivocal" and provides BPU review as a substitute for Faulkner Act review. Finally, it contends that the Appellate Division's holding is consistent with public policy, noting that OWUS provides only for residents and

businesses of townships separate from Trenton, and that the BPU is best equipped to govern sales of a regional nature, such as that of a utility system.

NJAW supports the City's arguments, emphasizing the Appellate Division's finding that allowing a small group of people from one municipality to undermine the complex BPU process would "eviscerate the carefully crafted statutory system established by the Legislature and render moot the [fifteen] month BPU process conducted to consider the [t]ransaction." NJAW further notes that the citizens failed to participate in the BPU process and declined to raise this issue at the public hearing.

Food & Water Watch, Inc. (FWW) supports the citizens' arguments, noting additionally that the limitation of the right to referendum must be found in a clear and express mandate. *City of Ocean City v. Somerville*, 403 *N.J.Super.* 345, 354–55, 958 *A.*2d 465 (App.Div.2008). FWW asserts that there was no express preemption in this case, and that the Appellate Division erred in implying preemption by section 3.1.

### III.

■ The instant matter concerns the intersection of the Faulkner Act and the MUL and thus constitutes a question of statutory interpretation, which is a purely legal issue and, thus, we owe no deference to the trial court's legal conclusions. *See Manalapan Realty v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

■ "Our task in statutory interpretation is to determine and effectuate the Legislature's intent." *Bosland v. Warnock Dodge Inc.*, 197 *N.J.* 543, 553, 964 *A.*2d 741 (2009) (citation omitted); *see also N.J.S.A.* 1:1–1 ("In the construction of the laws and statutes of this state, . . . words and phrases shall . . ., unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning. . . ."). Therefore, we will "look first to the

plain language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen." *Bosland, supra,* 197 *N.J.* at 553, 964 *A.*2d 741 (quoting *Pizzullo v. N.J. Mfrs. Ins. Co.,* 196 *N.J.* 251, 264, 952 *A.*2d 1077 (2008)). "A court should not resort to extrinsic interpretative aids when the statutory language is clear and unambiguous, and susceptible to only one interpretation." *Di-Prospero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) (internal quotation marks and citations omitted); *Burnett v. County of Bergen,* 198 *N.J.* 408, 421, 968 *A.*2d 1151 (2009). "The Legislature is presumed to be familiar with its own enactments, with judicial declarations relating to them, and to have passed or preserved cognate laws with the intention that they be construed to serve a useful and consistent purpose." *State v. Federanko,* 26 *N.J.* 119, 129, 139 *A.*2d 30 (1958).

 "[S]tatutes must be read in their entirety; each part or section should be construed in connection with every other part or section to provide a harmonious whole." *Burnett, supra,* 198 *N.J.* at 421, 968 *A.*2d 1151 (quoting *Bedford v. Riello,* 195 *N.J.* 210, 224, 948 *A.*2d 1272 (2008) (citation omitted)). "When reviewing two separate enactments, the Court has an affirmative duty to reconcile them, so as to give effect to both expressions of the lawmakers' will." *St. Peter's Univ. Hosp. v. Lacy,* 185 *N.J.* 1, 14, 878 *A.*2d 829 (2005) (internal quotation marks and citations omitted). "Statutes that deal with the same matter or subject should be read *in pari materia* and construed together as a unitary and harmonious whole." *Id.* at 14–15, 878 *A.*2d 829 (internal quotation marks and citations omitted).

That is the backdrop for our inquiry.

## IV.

The protest referendum is a fundamental element of the covenant that the Faulkner Act establishes between the government and the people. It operates as "a check on the exercise of local legislative power [and] foster[s] citizen involvement in the political

affairs of the community." *In re Ordinance 04–75, supra,* 192 *N.J.* at 459, 931 *A.2d* 595. In particular, the Act confers on the citizens "the right to test a challenged ordinance in the crucible of the democratic process." *Id.* at 450, 931 *A.2d* 595 (quoting *N.J.S.A.* 40:69A–185).

 The current version of the Faulkner Act relating to the referendum power states in pertinent part:

> The *voters shall also have the power of referendum which is the power to approve or reject at the polls any ordinance submitted by the council to the voters or any ordinance passed by the council, against which a referendum petition has been filed as herein provided.* No ordinance passed by the municipal council, except when otherwise required by general law or permitted by the provisions of section 17–32(b) of this act, shall take effect before twenty days from the time of its final passage and its approval by the mayor where such approval is required. If within twenty days after such final passage and approval of such ordinance a petition protesting against the passage of such ordinance shall be filed with the municipal clerk and if the petition shall be signed by a number of the legal voters of the municipality equal in number to at least 15% of the total votes cast in the municipality at the last election at which members of the General Assembly were elected, the ordinance shall be suspended from taking effect until proceedings are had as herein provided.
>
> [*N.J.S.A* 40:69A–185 (emphasis added).]

In other words, members of the public dissatisfied, for any reason, with an ordinance passed by the municipal council are entitled to protest that ordinance and express their opposition thereto by filing a referendum petition. Under the Faulkner Act, there are two exceptions to the public's right to demand a referendum:

> The provisions of this section shall not apply to any ordinance which by its terms or by law cannot become effective in the municipality unless submitted to the voters, or which by its terms authorizes a referendum in the municipality concerning the subject matter thereof.
>
> [*N.J.S.A.* 40:69A–185.]

As is obvious, those are entirely pragmatic provisions which recognize that where voter approval is otherwise required, Faulkner Act review would be unnecessary and duplicative. In other words, the Faulkner Act operates in cases in which the citizens are not otherwise provided with a right to protest an ordinance by referendum.

An ordinance "is subject to the [Faulkner Act] referendum process and must be placed on the ballot for voter review" if "there is no applicable statutory exception[.]" *In re Ordinance 04–75, supra,* 192 *N.J.* at 451, 931 *A.*2d 595. "Only the Legislature can make exceptions to the statutory mandate that 'any ordinance' is subject to referendum." *Ibid.* "It is the function of the Legislature, not the courts, to determine how much direct democracy through referendum should be conferred on the voters of a municipality." *Id.* at 467, 931 *A.*2d 595. In fact, "the referendum statute in the Faulkner Act should be liberally construed[.]" *Id.* at 459, 931 *A.*2d 595; *see also We the People Comm., Inc. v. City of Elizabeth,* 325 *N.J.Super.* 329, 332, 739 *A.*2d 430 (App.Div.1999) (finding Faulkner Act should be "liberally construed to promote the salutary objective of popular participation in local government") (citations omitted).

## V.

For guidance regarding how we interpret the Faulkner Act, we look to our most recent expression on the subject. *In re Ordinance 04–75, supra,* 192 *N.J.* at 451, 931 *A.*2d 595. There we directly addressed the issue of whether the Legislature excluded a particular ordinance from the purview of the Faulkner Act. In doing so, we read the referendum power in *N.J.S.A.* 40:69A–185 as applicable to "any ordinance," a term that we declared to be synonymous with "all ordinances." *Id.* at 461–64, 931 *A.*2d 595. However, we recognized that

the Legislature knew precisely how to exclude particular ordinances from the purview of the referendum statute when it wished to do so. Buttressing this point is the fact that throughout the *New Jersey Statutes Annotated* the Legislature has exempted particular ordinances from a referendum challenge.

For example, the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –129, provides that "[n]o zoning ordinance and no amendment or revision to any zoning ordinance shall be submitted to or adopted by initiative or referendum." *N.J.S.A.* 40:55D–62(b); *see also Tumpson v. Farina,* 240 *N.J.Super.* 346, 351, 573 *A.*2d 472 (App.Div.) (recognizing *N.J.S.A.* 40:55D–62 as statutory exception to referendum statute), *aff'd,* 120 *N.J.* 55, 575 *A.*2d 1368 (1990). The MLUL was enacted after passage of the Faulkner Act, demonstrating that the Legislature knew how to carve out exceptions to the referendum statute.

[*Id.* at 466, 931 *A.*2d 595.]

█ The gravamen of our opinion in *In re Ordinance 04-75* is that only where the Legislature has made clear its intention to carve out of the democratic processes provided in the Faulkner Act a particular type of ordinance, will courts immunize the ordinance from a Faulkner Act challenge. *Id.* at 466–68, 931 *A.*2d 595. By way of example, all of the statutes we cited in that case evidenced the required legislative clarity by specifically declaring that the ordinance at issue would become effective "without any referendum" or that the ordinance "shall not be subject to referendum." *See, e.g., N.J.S.A.* 27:19–26.5; *N.J.S.A.* 40:14B–48; *N.J.S.A.* 40:66A–52; *N.J.S.A.* 40:68A–19; *N.J.S.A.* 40:68A–56 (without any referendum); and *N.J.S.A.* 40:2–18 (repealed by *L.* 1960, *c.* 169, § 2, eff. Jan. 1, 1962) and *N.J.S.A.* 40A:4–3.2 (shall not be subject to referendum). We found those enactments to be clear and unequivocal exceptions to the holding of *any* referendum and expressive of a legislative intent to carve the ordinances out of the Faulkner Act's purview.

█ However, we cautioned that when the Legislature has acted in the past to create such a carve-out, it has done so "with such precision." *In re Ordinance 04-75, supra,* 192 *N.J.* at 467, 931 *A.*2d 595. Thus, we held that where the legislative intent is not clear "from the statute's text, legislative history, or place in the larger statutory scheme[,]" an intention to immunize an ordinance from a Faulkner Act challenge will not be found. *Ibid.* Put another way, in the absence of an unequivocal legislative expression to the contrary, citizens in a Faulkner Act municipality are empowered to protest any ordinance under the Act. The burden is on the party seeking to defeat the Faulkner Act to clearly establish the existence of a contrary legislative intent.

## VI.

█ We turn then to the MUL, which provides, in relevant part,

> Any municipality owning a sewer plant, water plant, heat, light or power plant, system of transportation, or other public utility plant or system, may lease or sell such plant or system.... Such a lease or sale to any person except another municipality, a sanitary sewerage authority, a sewerage authority or any other authority, commission or public body shall, except as otherwise provided by law, be made only upon compliance with the provisions of R.S. 40:62–4 and R.S. 40:62–5 and after the same is authorized by the legal voters of the municipality in accordance with said sections.
>
> [*N.J.S.A.* 40:62–3.]

Section 4 of the MUL sets forth the procedural requirements for a transfer including, among other things, notice, bidding, and advertisements. *N.J.S.A.* 40:62–4. Section 5, in turn, states:

> Upon the receipt of bids the governing body may adopt an ordinance providing for the lease or sale of the property. The ordinance shall set forth the terms and conditions upon which the same shall be leased or sold; the name, address and amount of bid of the highest responsible bidder therefor; a general description of the property to be leased or sold, and any other matters and things deemed necessary. The clerk of the governing body shall cause a certified copy of the ordinance to be served upon the officer charged with the duty of preparing election ballots, with a request that the question of the lease or sale as shown by the ordinances shall be placed upon the ballots used at the next succeeding general election in such municipality. Such officer shall have the question printed on the election ballots in substantially one of the following forms: "Shall the ............ plant be sold for the sum of ............?" "Yes." "No." "Shall the ............ plant be leased for a term of ............ years for the sum of ............ annual rental?" "Yes." "No."
>
> If a majority of the legal voters voting at such election shall vote "Yes," the governing body may accept the bid of the highest responsible bidder and carry out such lease or sale as authorized by the election.
>
> [*N.J.S.A.* 40:62–5.]

Thus, under *N.J.S.A.* 40:62–3, an ordinance authorizing a transfer of a water utility to any person (except a public entity) cannot become effective without prior voter approval. That mandatory prior voter approval, in turn, insulates such a private sale from a separate protest referendum under the Faulkner Act because the voters already have been heard. Contrariwise, and the City does not dispute this, because section 3 does not mandate a referendum in connection with a sale to a public entity, such a sale remains subject to the provisions of the Faulkner Act and may be challenged by a referendum petition filed by fifteen percent of the voters.

However, the MUL also contains an exception to section 3. Section 3.1 provides:

> If the governing body of any municipality shall deem it advisable in the interests of public health and safety to transfer a municipal water utility system serving less than 5% of the population of that municipality, to any person or another municipality or any authority, commission or other public body, the transfer shall be authorized by ordinance and may be made upon such terms as the ordinance shall provide, and the provisions of R.S. 40:62–4 and R.S. 40:62–5 shall not apply thereto. The terms of such sale and the ordinance authorizing same shall be subject to review by the Board of Public Utilities and shall provide that the purchaser shall have the privilege to operate the system within the area of the municipality covered.
>
> [*N.J.S.A.* 40:62–3.1.]

Under that provision any transfer of a water utility serving less than five percent of the population of the municipality may be effectuated by ordinance without the mandatory procedures and prior voter approval ordinarily required under *N.J.S.A.* 40:62–4 and –5. In those circumstances, the ordinance is subject to review by the BPU.

The question presented is whether the exception to section 3 in section 3.1 writes the Faulkner Act out of the picture. We think the answer is "no," because we do not discern in the MUL a clear expression of intent to foreclose the public from challenging an ordinance under the Faulkner Act.

## VII.

### A.

We begin with the words of the MUL. Unlike the examples cited in *In re Ordinance 04–75,* section 3.1 does not say that a less-than-five-percent sale may take place "without any referendum." Nor does it say that such a sale "shall not be subject to referendum." Rather, in a narrow and precise way, it excepts a less-than-five-percent sale only from the mandatory provisions of *N.J.S.A.* 40:62–4 and –5. There is a chasm between that limited carve-out and the ones we recognized in *In re Ordinance 04–75.* Indeed, there is simply nothing in the words the Legislature chose in section 3.1 that would suggest, even obliquely, an intention to

take away the right of citizens, plainly embodied in section 3, to protect an ordinance under the Faulkner Act.

That distinction, which we think the lower courts overlooked, is critical. It is one thing to say that every less-than-five-percent sale should not be subject to *automatic* referendum under *N.J.S.A.* 40:62–5 or to the procedural requirements prescribed in *N.J.S.A.* 40:62–4. It is quite another to silence the electorate altogether. Our reading of the words of *N.J.S.A.* 40:62–3.1 simply does not square with the City's suggestion that it was intended to eliminate a Faulkner Act petition. In our view, the only effect of the precise language in section 3.1 which eliminates compulsory voter approval is to create a parallel structure to section 3 and return such a sale to the volitional protest provisions of the Faulkner Act.

### B.

The legislative history of the MUL sheds no more light on the section 3.1 exception than the words of the Act itself. In its original form, *N.J.S.A.* 40:62–3 provided, in relevant part, "[i]t shall be lawful for any municipality owning a . . . water plant . . . to lease or make sale of such plant or system, provided such lease or sale shall be authorized by the legal voters of such municipality." *L.* 1917, *c.* 152, art. XXXV, § 1. In other words, all sales were subject to mandatory voter approval. In May 1948, the section was amended to provide that the referendum requirements of *N.J.S.A.* 40:62–4 and –5 would apply only to "a lease or sale to any person except another municipality." *L.* 1948, *c.* 232, § 1. The purpose of the amendment was "to authorize municipalities owning a utility plant . . . to convey or lease it to another municipality . . . by ordinance without incurring the expense and delay of a referendum on the proposal." Statement to [Official Copy Reprint] A., No. 499, 172d Leg. 1 (N.J.1948). That statement of purpose acknowledged that the referendum requirement was "perhaps desirable" and noted that that provision had been "preserved in connection with sales or leases to private interests

..." *Ibid.* The exemption to the referendum requirement was later expanded to include leases or sales "to another municipality, a sanitary sewerage authority, a sewerage authority or any other authority, commission or public body." *L.* 1948, *c.* 397, § 1. The stated purpose was the same as that of the earlier 1948 amendment. Statement to [Official Copy Reprint] A., No. 553, 172d Leg. 1 (N.J.1948).

More than thirty years later, and after the passage of the Faulkner Act, the Legislature enacted *N.J.S.A.* 40:62–3.1:

[i]f the governing body of any municipality shall deem it advisable in the interests of public health and safety to transfer a municipal water utility system serving less than 5% of the population of that municipality, to any person or another municipality or any authority, commission or other public body, the transfer shall be authorized by ordinance and may be made upon such terms as the ordinance shall provide, and the provisions of R.S. 40:62–4 and R.S. 40:62–5 shall not apply thereto.

[*L.* 1981, *c.* 16, § 2.]

The bill was further amended to require that "[t]he terms of such sale and the ordinance authorizing same shall be subject to review by the Board of Public Utilities and shall provide that the purchaser shall have the privilege to operate the system within the area of the municipality covered." *Ibid.* From that history we can glean an intention on the part of the Legislature to free sales affecting less than five percent of the population of that municipality from the compulsory provisions of *N.J.S.A.* 40:62–4 and –5, no more and no less. Beyond that the history is silent and we do not discern from that silence a clear intention on the part of the Legislature to eliminate a protest under the Faulkner Act.

## C.

Nor can we glean from the larger scheme provided by the MUL any intention to eviscerate the provisions of the Faulkner Act. To be sure, BPU approval is provided and the City argues that that review could only have been intended as a substitute for a Faulkner Act referendum. That argument, however, misconceives the differences between the two processes of which we presume the Legislature was aware.

Indeed, *N.J.S.A.* 48:2–51.1 provides:

In considering a request for approval of an acquisition of control, the board shall evaluate the impact of the acquisition on competition, on the rates of ratepayers affected by the acquisition of control, on the employees of the affected public utility or utilities, and on the provision of safe and adequate utility service at just and reasonable rates.

[*N.J.S.A.* 48:2–51.1.]

Thus, a contract of sale is scrutinized with those matters in mind. Whether the decision to sell makes good political sense or is a wise choice is not a part of the BPU's calculus. Indeed, the BPU's decision in this case addresses every constituency except the citizens of the City of Trenton.

To the contrary, a Faulkner Act protest referendum has a broader reach insofar as it permits the wisdom of a particular ordinance to be protested, thus sweeping in a sale that might not affect rates or service, but which might nevertheless be antithetical to the political interests of the voters.

This case is emblematic of that difference. Here the citizens are challenging the "concept" of the sale as an unwise one-time budget fix that will ultimately injure the City. The BPU has no interest in that political question. However, if fifteen percent of voters wish to challenge the good sense of the ordinance, they have the right to do so under the Faulkner Act. It seems evident to us that the Legislature understood that BPU review is not a substitute for a protest referendum by the citizens of a municipality whose government has enacted an ordinance. Rather, it seems more likely to have been intended as a safety valve to protect those citizens who had no say in the process—for example, the OWUS customers in Ewing, Hamilton, Hopewell and Lawrence. It follows that the inclusion of that remedy is no clear indication that the Legislature intended the citizens to be stripped of their Faulkner Act rights. Indeed, the MUL falls far short of the kind of clarity we required in *In re Ordinance 04–75* in order to exclude an enactment from the operation of the Faulkner Act.

Other rules of interpretation point in the same direction. First, because of their democratic implications, the referendum provi-

sions of the Faulkner Act are to be liberally construed. *In re Ordinance 04–75, supra,* 192 *N.J.* at 459, 931 *A.*2d 595; *We the People, supra,* 325 *N.J.Super.* at 332, 739 *A.*2d 430. Further, in interpreting distinct statutory schemes, as we do here, every effort should be made to reconcile them and give effect to both wherever possible. *St. Peter's, supra,* 185 *N.J.* at 14, 878 *A.*2d 829. As we see it, the only way to give voice to the Faulkner Act and to reconcile it with the MUL is to take *N.J.S.A.* 40:62–3.1 at face value. In so doing, we interpret it as eliminating only the mandatory requirement of an *N.J.S.A.* 40:62–5 referendum, but not the citizens' right to contest an ordinance if they choose to do so as provided by the Faulkner Act. We cannot find in section 3.1 a clear intention on the part of the Legislature to muzzle the electorate. Indeed, we read the MUL as consonant with the rights afforded by the Faulkner Act.

## VIII.

Because the democratic processes reserved to the people by the Faulkner Act referendum provision cannot be abridged except with express legislative approval, which we find absent here, the judgment of the Appellate Division is reversed.

Chief Justice RABNER, dissenting.

I would affirm the judgment of the Appellate Division substantially for the reasons expressed in Judge Carchman's thoughtful opinion. *In re Petition for Referendum on Trenton Ordinance 09–02,* 411 *N.J.Super.* 135, 984 *A.*2d 895 (App.Div.2009).

*For reversal*—Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS—5.

*For affirmance*—Chief Justice RABNER—1.