25 A.3d 1063

FAIR SHARE HOUSING CENTER, INC., PLAINTIFF–APPELLANT, v. NEW JERSEY STATE LEAGUE OF MUNICIPALITIES, DEFENDANT–RESPONDENT.

Argued May 4, 2011—Decided August 23, 2011.

*Kevin D. Walsh* argued the cause for appellant.

*Trishka Waterbury* argued the cause for respondent (*Mason, Griffin & Pierson and Kearns, Reale & Kearns,* attorneys; *Ms. Waterbury* and *William J. Kearns, Jr.,* of counsel).

*Edward L. Barocas* argued the cause for amicus curiae American Civil Liberties Union of New Jersey Foundation, Inc. (*Mr. Barocas,* attorney; *Mr. Barocas, Jeanne M. LoCicero,* and *Bobby D. Conner,* on the brief).

Justice ALBIN delivered the opinion of the Court.

The New Jersey State League of Municipalities (League) is a nonprofit, unincorporated association created pursuant to statutory authority, *N.J.S.A.* 40:48–22. The League represents all 566 of New Jersey's municipalities. The League's governing board con-

sists of various elected municipal officials, its budget is partly financed through public funds, and its employees are members of the Public Employees' Retirement System. Part of the League's mission is to lobby for beneficial legislation and to file lawsuits furthering the interests of municipalities as a whole.

The issue before us is whether the League is a "public agency" that possesses "government record[s]" within the meaning of the Open Public Records Act (OPRA), *N.J.S.A.* 47:1A–1 to –13. The trial court concluded that under OPRA the League is not a public agency, primarily because it does not carry out any traditional governmental function. The court therefore dismissed the lawsuit filed by Fair Share Housing Center, Inc. (Fair Share) demanding the release of certain records in the League's possession. The Appellate Division affirmed. *Fair Share Hous. Ctr., Inc. v. N.J. State League of Municipalities*, 413 *N.J.Super.* 423, 434, 995 *A.*2d 865 (App.Div.2010).

We now reverse. The League meets the definition of a public agency for OPRA purposes—it is an "instrumentality ... created by ... political subdivisions." *See N.J.S.A.* 47:1A–1.1. As a public agency, the League must make available government documents as required by OPRA. We remand to the trial court to determine whether the documents requested by Fair Share fall within the class of documents that must be made available under OPRA.

I.

A.

In 1915, an Act of the Legislature authorized the creation of the New Jersey State League of Municipalities.[1] *See L.* 1915, *c.*

---

[1] This case comes before us based on the trial court's dismissal of Fair Share's complaint. The facts within the relevant timeframe, which are based on the pleadings and certifications, are essentially undisputed. No testimony was taken. Our charge is to decide an issue of law that is contested by the parties. When deciding a purely legal issue, review is de novo; we look at the law with fresh eyes and need pay no deference to legal conclusions reached by the trial

163. That year the League came into being. The current version of the 1915 Act is now set forth in *N.J.S.A.* 40:48–22. That statute provides: "Any municipality ... may join with any other municipality or municipalities in the formation of an organization of municipalities, for the purpose of securing concerted action in behalf of such measures as the organization shall determine to be in the common interest of the organizing municipalities." *N.J.S.A.* 40:48–22.

The League is a nonprofit, unincorporated association, today representing all of New Jersey's 566 municipalities. The objectives of the League, which are set forth in its constitution, include "[t]he promotion of the general welfare of the municipalities of the State"; "[t]he study and advocacy of necessary and beneficial legislation affecting municipalities and the opposition of legislation detrimental thereto"; and the taking of "such action or actions in the interest of the public welfare as are permitted by" law. More than 13,000 elected and appointed municipal officials, including over 560 mayors, are members of the League. The League's officers consisted of three mayors and a municipal council member during the relevant time period. Its seventeen employees are members of the Public Employees' Retirement System (PERS). A 1955 Attorney General Memorandum Opinion declared that the League was "a public agency or organization" and therefore "its employees are eligible for membership in [PERS]." [2]

---

court or Appellate Division. *See Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan,* 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995); *see also Tractenberg v. Twp. of W. Orange,* 416 *N.J.Super.* 354, 365, 4 *A.*3d 585 (App.Div.2010) (noting that issues of law raised in summary proceedings under OPRA are subject to de novo review).

[2] The PERS statute, *N.J.S.A.* 43:15A–65, provides: "All employees of *any public agency or organization* of this State, which employs persons engaged in service to the public, shall be eligible to participate in the Public Employees' Retirement System; provided the employer consents thereto ...." (emphasis added). For PERS purposes, a "public agency or organization" is defined as "any agency or organization which operates public works or is engaged in service to the public for 1 or more municipalities, local boards of health, or

Sixteen percent of the League's budget is comprised of taxpayer public funds in the form of membership fees from each municipality. More than one-half of the League's annual income is raised at a yearly convention.

The League—according to its executive director—"is a lobbying organization for local government interests as a whole in New Jersey," and its officials "testify at State Legislative hearings on a variety of issues of interest to local government." In addition to publishing a magazine, the League also "conducts many educational programs for local government officials on subjects of interest to municipalities."

Moreover, the League has instituted legal actions for the purpose of advancing the interests of its member municipalities. *See, e.g., N.J. State League of Municipalities v. Kimmelman*, 105 *N.J.* 422, 522 *A.*2d 430 (1987); *N.J. State League of Municipalities v. State*, 257 *N.J.Super.* 509, 608 *A.*2d 965 (App.Div.1992). The caption of this latter case refers to the League as a "public agency."

## B.

In 2008, the Council on Affordable Housing (COAH), acting pursuant to the Fair Housing Act, *N.J.S.A.* 52:27D–301 to –329.19, proposed regulations to "establish the obligations of municipalities to provide affordable housing during the 'third round' period from 1999 to 2018 and provide mechanisms for municipalities to achieve compliance with those obligations." *In re Adoption of N.J.A.C. 5:96 and 5:97,* 416 *N.J.Super.* 462, 470–71, 6 *A.*3d 445 (App.Div. 2010), *certif. granted,* 205 *N.J.* 317, 15 *A.*3d 325 (2011). As part of the rulemaking process, in March 2008 the League filed comments with COAH opposing the proposed Third Round regulations. The League expressed its concern that the "nearly $19 billion" cost of complying with the proposed regulations—a cost that would be

counties, and whose revenue is derived from other than State funds." *N.J.S.A.* 43:15A–71.

borne "solely [by] builders and municipal property taxpayers"—would "negatively impact the economy of the State, and [would] impose substantial burdens on the property taxpayer in contravention of the Fair Housing Act."

Shortly afterwards, Fair Share Housing Center, Inc. wrote to the League's Executive Director, William Dressel, requesting particular documents pursuant to OPRA.[3] Specifically, Fair Share's letter requested: (1) "any studies, correspondence or other public records that were generated by any League employee or consultant" relating to the League's assertion that the proposed COAH regulations would impose substantial burdens on taxpayers; (2) letters and emails either received from the League or sent to COAH regarding the Third Round regulations; and (3) all documents provided to certain named League committees.

In his reply, Mr. Dressel declined to provide the requested documents on the ground that the League "is not covered by" OPRA.

## C.

On May 16, 2008, Fair Share filed a verified complaint in lieu of prerogative writs in the Superior Court, Law Division, Mercer County, alleging that the defendant League was in violation of OPRA and the common law right of access by refusing to make

---

[3] In its complaint, Fair Share describes itself as a "non-profit advocate of the *Mount Laurel* doctrine." *See generally S. Burlington Cnty. N.A.A.C.P. v. Twp. of Mount Laurel,* 67 *N.J.* 151, 336 A.2d 713 (1975) (*Mount Laurel I* ) (holding land-use regulations unconstitutional if municipalities fail to provide low- and moderate-income families realistic opportunities for housing); *S. Burlington Cnty. N.A.A.C.P. v. Twp. of Mount Laurel,* 92 *N.J.* 158, 456 A.2d 390 (1983) (*Mount Laurel II* ) (expanding remedies available to enforce *Mount Laurel I* ). *Mount Laurel II* provides standing to "any organization that has the objective of[ ] securing lower income housing opportunities in a municipality." *Mount Laurel II, supra,* 92 *N.J.* at 337, 456 A.2d 390. As an advocate for lower-income households, Fair Share has participated in litigation "involving challenges to exclusionary zoning practices."

available the requested documents.[4] Among other things, Fair Share sought "[a] declaration that the League is a 'public agency' as that term is defined by *N.J.S.A.* 47:1A–1.1 and is subject to [OPRA] and the common law right [of access]." Fair Share also sought "[a]n order directing the League to permit the trial court to review all public records implicated by [Fair Share's] request in camera." Eleven days later, Fair Share supplemented its complaint with an order to show cause seeking the same relief.

The League answered that it "is not a 'public agency' as defined by [OPRA], and as such, the League's records are not 'government records' or 'public records.'" The League also denied that it is subject to the common law right of access.

While the case was pending in Superior Court, on June 23 and 25, 2008 Mr. Dressel wrote to the Government Records Council indicating that he had "received a request for copies of League documents" and asked whether the Council could "by letter, confirm that the League is not a public agency for purposes of OPRA." The Government Records Council is an entity authorized to hear complaints concerning denials of access to government records and to issue advisory opinions. *N.J.S.A.* 47:1A–7. On June 26, 2008, in an advisory opinion, the Council responded that the League "is not a public agency under OPRA." [5]

---

[4] In its complaint, Fair Share referred "to the common law right to know." The Right–to–Know Law was replaced by OPRA in 2002. *L.* 2001, *c.* 404. *N.J.S.A.* 47:1A–8 states that nothing in OPRA "shall be construed as limiting *the common law right of access* to a government record." (Emphasis added). To avoid confusion, we will refer to the common law right of access.

[5] The propriety of the League's seeking an advisory opinion from the Council when jurisdiction was vested in the Superior Court is not before us. Under OPRA, a requestor seeking relief from a denial of access to a government record has two options: either to institute a proceeding in the Superior Court or to "file a complaint with the Government Records Council." *N.J.S.A.* 47:1A–6. "The right to institute any proceeding under [OPRA] shall be solely that of the requestor." *Ibid.* Furthermore, *N.J.S.A.* 47:1A–7 (g) states "[t]he [C]ouncil shall not have jurisdiction over the Judicial" branch of government.

### D.

The trial court dismissed Fair Share's complaint, holding that the League is not a "public agency" as defined in *N.J.S.A.* 47:1A–1.1 and therefore not subject to OPRA. The court concluded that the League is not a "public agency" because it is not an "instrumentality within or created by a political subdivision of the State or combination of subdivisions," *see N.J.S.A.* 47:1A–1.1, such as a county health board or regional planning board. It further determined that the "League is not a 'public agency' under *N.J.S.A.* 47:1A–1.1 [because] (1) it does not perform a governmental function; and (2) it is not authorized to spend public funds." Nor did it find that the League met what the trial court described as OPRA's "control and creation test" as discussed in *Times of Trenton Publishing Corp. v. Lafayette Yard Community Development Corp.*, 183 *N.J.* 519, 874 *A.*2d 1064 (2005).[6] The court reasoned that "the League's creation was not mandated but only authorized under *N.J.S.A.* 40:48–22" and that "no particular municipality controls the League."

The court considered the League to be similar "to a trade association, serving in a lobbying capacity and providing information to its membership on matters" of concern. The court gave no weight to the 1955 Attorney General Memorandum Opinion allowing League employees to enroll in PERS because "the League is an organization and not a 'public agency' under PERS [and] OPRA." Last, the court noted its agreement with the Government Record Council's advisory opinion that the League was not a public agency for OPRA purposes while acknowledging that the Council's decision was not binding on it.

---

[6] In *Lafayette Yard,* the Court held that a private, nonprofit redevelopment corporation was subject to OPRA because "the Corporation could only have been '*created*' with" the municipality's approval. 183 *N.J.* at 522, 535–36, 874 *A.*2d 1064 (emphasis added). The Court also held that the nonprofit corporation was subject to the Open Public Meetings Act, *N.J.S.A.* 10:4–6 to –21, because it performed a " 'governmental function.' " *Id.* at 532, 874 *A.*2d 1064 (quoting *N.J.S.A.* 10:4–8(a)).

The court did not address Fair Share's common-law-right-of-access claim.

### E.

The Appellate Division affirmed. *Fair Share Hous. Ctr., Inc. v. N.J. State League of Municipalities,* 413 *N.J.Super.* 423, 434, 995 *A.*2d 865 (App.Div.2010). The panel rejected Fair Share's argument that the League was a "combination of political subdivisions" and thus a "public agency" under *N.J.S.A.* 47:1A–1.1. *Id.* at 429, 995 *A.*2d 865. The panel reasoned that "to constitute a political subdivision, an entity must provide some governmental service, such as education, police protection, maintenance of roadways, sewage disposal, or urban renewal." *Ibid.* Because the League is not similar to "a governmental entity created by two or more municipalities to provide" such services, it could not be deemed a "public agency" under OPRA. *Id.* at 430, 995 *A.*2d 865. The panel compared the League to "a private association such as the Chamber of Commerce." *Ibid.*

The panel also concluded that the League was not in possession of a "government record," as that term is defined in *N.J.S.A.* 47:1A–1.1, for the simple reason that the League could not be "viewed as a 'subordinate board' of a political subdivision." *Id.* at 431, 995 *A.*2d 865. The panel distinguished the League from the private, nonprofit corporation in *Lafayette Yard,* which was created to redevelop a blighted area. *Id.* at 432, 995 *A.*2d 865. That corporation "was established and controlled by a municipality to provide a vital public service," thus making "[it] an 'instrumentality' of that municipality." *Ibid.*

Last, the panel denied Fair Share relief on its common-law-right-of-access claim for the same reasons it denied relief on its OPRA claim. *Id.* at 433, 995 *A.*2d 865. The panel repeated that the League is merely "an advisor to, and advocate for, municipalities and municipal officials" and "does not perform any governmental function." *Ibid.*

We granted Fair Share's petition for certification. *Fair Share Hous. Ctr., Inc. v. N.J. State League of Municipalities*, 205 *N.J.* 97, 13 *A.*3d 361 (2010). We also granted the motion of the American Civil Liberties Union of New Jersey (ACLU) to participate as amicus curiae.

## II.

Fair Share claims the League does not have to perform a governmental function, for OPRA purposes, to fit the "public agency" definition of *N.J.S.A.* 47:1A–1.1. According to Fair Share, the League is a public agency because it "was created and is controlled by municipalities." It argues that the Appellate Division "erred in departing from the plain language of *N.J.S.A.* 47:1A–1.1 and in ignoring the creation and control test articulated in *Lafayette Yard.*" Alternatively, it submits that a "taxpayer-funded organization that lobbies on behalf of government," such as the League, satisfies the Appellate Division's governmental-function test.

In support of Fair Share's position, amicus ACLU submits that the League is an "instrumentality" created by "a combination of political subdivisions," *see N.J.S.A.* 47:1A–1.1, and therefore is subject to OPRA. It asserts that the Appellate Division took a "cramped view" of the language used in defining "public agency" by "linking coverage under OPRA to whether such an 'instrumentality' performs the traditional, essential-type services that a single municipality would perform." It also asserts that the Appellate Division " 'elevated form over substance,' " contrary to the dictates of *Lafayette Yard,* by ignoring that the League is composed exclusively of municipal officials, is financed in part by municipal taxes, and is the lobbying arm of municipalities.

In contrast, the League maintains that the Appellate Division properly decided that "public agency," as defined in *N.J.S.A.* 47:1A–1.1, requires a "political subdivision" or its "instrumentalilty" to perform a governmental function and that lobbying does not pass that test. The League distinguishes itself from the corpora-

tion in *Lafayette Yard* that was found to be a "public agency" for OPRA purposes. According to the League, the Appellate Division "correctly stated" that the corporation in *Lafayette Yard* "was an instrumentality or agency of the City of Trenton, *exercising a governmental function,* and therefore was subject to OPRA." Based on its reading of *Lafayette Yard* and the plain language of *N.J.S.A.* 47:1A–1.1, the League insists that it is not a "public agency" under OPRA.

### III.

We must decide two strictly legal and interrelated issues—the meaning of "public agency" and "government record," as those terms are used in *N.J.S.A.* 47:1A–1.1 of the Open Public Records Act, *N.J.S.A.* 47:1A–1 to –13. Only if the League of Municipalities qualifies as a "public agency" that maintains "government record[s]" under OPRA must it then respond to the document requests made by Fair Share Housing Center, Inc.

In determining the issues in dispute, we first look to the general objectives of OPRA, then turn to the contested statutory language and other relevant provisions, and last inform our discussion with an analysis of *Lafayette Yard.*

### A.

In passing OPRA, the Legislature declared that it is the State's public policy that "government records shall be readily accessible for inspection, copying, or examination by the citizens of this State, with certain exceptions, for the protection of the public interest." *N.J.S.A.* 47:1A–1. It added that "any limitations ... shall be construed in favor of the public's right of access." *Ibid.* Thus, "all government records shall be subject to public access unless" those records fit within an enumerated exception. *Ibid.*

"The purpose of OPRA 'is to maximize public knowledge about public affairs ... and to minimize the evils inherent in a secluded process.'" *Lafayette Yard, supra,* 183 *N.J.* at 535, 874

A.2d 1064 (quoting *Asbury Park Press v. Ocean Cnty. Prosecutor's Office*, 374 *N.J.Super.* 312, 329, 864 *A.2d* 446 (Law Div.2004)). Those who enacted OPRA understood that knowledge is power in a democracy, and that without access to information contained in records maintained by public agencies citizens cannot monitor the operation of our government or hold public officials accountable for their actions. An underlying premise of OPRA is that society as a whole suffers when "governmental bodies are permitted to operate in secrecy." *See Asbury Park Press, supra*, 374 *N.J.Super.* at 329, 864 *A.2d* 446.

### B.

With those general principles in mind, it is our task to construe the meaning of particular terms in *N.J.S.A.* 47:1A–1.1. In doing so, we rely on basic canons of statutory construction. First, when interpreting a statute, "generally, the best indicator of [the Legislature's] intent is the statutory language" itself. *DiProspero v. Penn*, 183 *N.J.* 477, 492, 874 *A.2d* 1039 (2005). We must read a statute's "words and phrases" within "their context" and give them "their generally accepted meaning." *N.J.S.A.* 1:1–1. If the statute's plain language reveals the Legislature's intent, we need proceed no further. *Bosland v. Warnock Dodge, Inc.*, 197 *N.J.* 543, 553, 964 *A.2d* 741 (2009). However, we do not look at words and phrases in a vacuum; " 'statutes must be read in their entirety' " and construed in harmony with one another so that a proper meaning can be given to the whole of an enactment. *Burnett v. Cnty. of Bergen*, 198 *N.J.* 408, 421, 968 *A.2d* 1151 (2009) (quoting *Bedford v. Riello*, 195 *N.J.* 210, 224, 948 *A.2d* 1272 (2008)). Second, we will not insert an " 'additional qualification' " into a clearly written statute when " 'the Legislature pointedly omitted' " doing so. *DiProspero, supra*, 183 *N.J.* at 492, 874 *A.2d* 1039 (quotation omitted). Last, we presume that the Legislature is familiar with laws it already has enacted when choosing particular language for inclusion in a new statute. *In re Petition for*

*Referendum on City of Trenton Ordinance 09–02*, 201 *N.J.* 349, 359, 990 *A.*2d 1109 (2010).

## C.

This case turns on the meaning of "public agency." *N.J.S.A.* 47:1A–1.1 is broadly written so that a wide variety of entities fall within the compass of that term. *N.J.S.A.* 47:1A–1.1 defines "public agency" or "agency" as

> any of the principal departments in the Executive Branch of State Government, and any division, board, bureau, office, commission or other instrumentality within or created by such department; the Legislature of the State and any office, board, bureau or commission within or created by the Legislative Branch; and any independent State authority, commission, instrumentality or agency. The terms also mean any political subdivision of the State or combination of political subdivisions, and any division, board, bureau, office, commission or other instrumentality within or created by a political subdivision of the State or combination of political subdivisions, and any independent authority, commission, instrumentality or agency created by a political subdivision or combination of political subdivisions.

Parsing the words of the statute, a "public agency" includes an "instrumentality ... created by a ... combination of political subdivisions." *N.J.S.A.* 47:1A–1.1. That plain language places the League squarely within the term "public agency."

 OPRA does not define "instrumentality." We therefore will give the word its "generally accepted meaning." *See N.J.S.A.* 1:1–1. Instrumentality is variously defined as "[a] thing used to achieve an end or purpose" and, alternatively, as "[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body." *Black's Law Dictionary* 814 (8th ed. 2004). Here, the League is achieving an end and providing a function on behalf of all 566 of New Jersey's municipalities. It is "securing concerted action in behalf of ... the common interest of the organizing municipalities"—that is, the municipalities that established and presently support the League. *See N.J.S.A.* 40:48–22. The maxim that there is strength in numbers comes into play here. Through the pooling of financial contributions and personnel, the League—in a more efficient and cost-effective way—can do for all municipalities what no one

municipality can do for itself. The League lobbies the Legislature, and its officials testify before legislative committees to advance the interests of municipalities. It conducts educational programs for municipal officials. It also brings lawsuits that will benefit all municipalities. In this case, the League forwarded to COAH comments critical of the proposed Third Round regulations governing the affordable housing obligations of municipalities for low- and moderate-income families.

The League is controlled by elected or appointed officials from the very municipalities it represents. The League's constitution provides that, generally, "each member municipality shall act and be represented by its Mayor or other chief executive authority, or his nominee." Thus, it is clear that the League is an "instrumentality" of a "combination of political subdivisions." *See N.J.S.A.* 47:1A–1.1.

It is also clear that a "combination of political subdivisions"—the municipalities of this State—"created" the League. *See N.J.S.A.* 47:1A–1.1; *accord Lafayette Yard, supra,* 183 *N.J.* at 535, 874 *A.*2d 1064. The League came into being the same year, 1915, that the predecessor to *N.J.S.A.* 40:48–22 was enacted. *See L.* 1915, *c.* 163. *N.J.S.A.* 40:48–22 allows for the formation of the League. With that statutory authorization, the member municipalities created the League by forming a nonprofit, unincorporated association and drafting a constitution that would govern the organization.

This simple plain-language approach leads to the conclusion that the League is a "public agency." The language of *N.J.S.A.* 47:1A–1.1 does not set forth a governmental-function test—that is, it does not suggest that the "instrumentality" must perform a traditional governmental task, such as trash collection. Both the trial court and Appellate Division went astray by importing into OPRA's definition of "public agency" the definition of "public body" found in the Open Public Meetings Act (OPMA), *N.J.S.A.* 10:4–6 to –21. They also mistakenly construed *Lafayette*

*Yard* by conflating those very different terms in very different statutes.

### D.

 Under OPMA, if an entity meets the definition of a "public body," defined by *N.J.S.A.* 10:4–8(a), it "must open its meetings to the public." *Lafayette Yard, supra,* 183 *N.J.* at 530, 874 *A.*2d 1064. An entity qualifies as a "public body" if it either performs a governmental function or is authorized to expend public funds. *N.J.S.A.* 10:4–8(a).[7] The language defining a "public body" under OPMA and the language defining "public agency" under OPRA are distinctly different. The definition of "public agency" is far more encompassing and specifically lacks a governmental-function test. *See N.J.S.A.* 47:1A–1.1. The more sweeping language of "public agency" interdicts creative efforts that might thwart the public's efforts to access governmental records. For example, under OPRA, a political subdivision or combination of subdivisions that *created* a nonprofit corporation for the purpose of warehousing documents, otherwise subject to disclosure, would be an "instrumentality" and therefore a "public agency," even though it does not perform any traditional governmental function.

The Open Public Meetings Act became law in January 1976. *L.* 1975, *c.* 231, § 1. OPRA became effective twenty-six years later in 2002, *L.* 2001, *c.* 404, § 18, replacing its predecessor The Right–to–Know Law, *see L.* 1963, *c.* 73, § 2. The definition of "public agency" and "agency" contained in *N.J.S.A.* 47:1A–1.1 first appeared in the 2002 iteration of OPRA. *L.* 2001, *c.* 404, § 2. The Legislature obviously was aware of the governmental-function test it used to define "public body" in OPMA. *See In re Petition for*

---

[7] *N.J.S.A.* 10:4–8(a) defines "public body" as

> a commission, authority, board, council, committee or any other group of two or more persons organized under the laws of this State, and collectively empowered as a voting body *to perform a public governmental function* affecting the rights, duties, obligations, privileges, benefits, or other legal relations of any person, or collectively authorized to spend public funds. [ (Emphasis added).]

*Referendum on City of Trenton Ordinance 09–02, supra*, 201 *N.J.* at 359, 990 *A.*2d 1109 (noting that Legislature is presumed to be knowledgeable about its previous enactments). Yet it chose not to employ the same test in defining "public agency" in OPRA. It is not the charge of this Court to rewrite a plainly worded statute by inserting an " 'additional qualification' " that " 'the Legislature pointedly omitted.' " *See DiProspero, supra*, 183 *N.J.* at 492, 874 *A.*2d 1039 (quotation omitted).

We have no authority, or reason, to erect artificial judicial hurdles for a citizen to gain access to a government record, particularly in light of OPRA's mandate that "any limitations ... shall be construed in favor of the public's right of access." *N.J.S.A.* 47:1A–1. Moreover, in *Lafayette Yard*, we were careful to maintain the separation between the definitions of "public body" in OPMA and "public agency" in OPRA. 183 *N.J.* at 533–36, 874 *A.*2d 1064.

## E.

In *Lafayette Yard*, we held that a private, nonprofit corporation (Lafayette Yard) created to assist the City of Trenton (City) and the Trenton Parking Authority to redevelop a 3.1 acre site was both a "public body" for purposes of OPMA and a "public agency" for purposes of OPRA. *Id.* at 522, 533–36, 874 *A.*2d 1064. Lafayette Yard was incorporated "by public-spirited citizens" who apparently were acting on behalf of the City. *Id.* at 535, 874 *A.*2d 1064. It was established to issue tax-exempt bonds to finance the redevelopment project, and the City pledged its " 'full, faith and credit' ... in support of the bonds." *Id.* at 531, 874 *A.*2d 1064. Lafayette Yard purchased the property to be redeveloped from the City for one dollar. *Id.* at 524, 874 *A.*2d 1064. After the retirement of the indebtedness, the property owned by Lafayette Yard would revert to the City. *Id.* at 531, 874 *A.*2d 1064. The mayor and city council, for the most part, controlled the appointments to the governing board of Lafayette Yard. *Ibid.*

We concluded that "a redeveloper such as Lafayette Yard, controlled in large measure by a municipality and supported by

the municipality's taxing power, performs a 'governmental function' under OPMA ... and, therefore, is a 'public body' subject to OPMA." *Id.* at 532, 874 *A.*2d 1064 (internal citation omitted). For that reason, a newspaper reporter had a right to attend various board meetings of Lafayette Yard. *Id.* at 521–22, 874 *A.*2d 1064.

We separately considered whether Lafayette Yard was a "public agency" under OPRA and whether the reporter had a right of access to the minutes of the board's meetings. *Id.* at 522, 534–36, 874 *A.*2d 1064. In our discussion of the subject, we did not use a governmental-function analysis. *See id.* at 534–35, 874 *A.*2d 1064. The claim was that Lafayette Yard was an " 'instrumentality or agency ... created by a political subdivision' under *N.J.S.A.* 47:1A–1.1" and therefore a public agency. *Id.* at 534, 874 *A.*2d 1064. We declared that to accept Lafayette Yard's explanation "that it was not 'created' by 'a political subdivision of the State[ ]' ... would be to elevate form over substance [and would] reach a result that subverts the broad reading of OPRA as intended by the Legislature." *Id.* at 535, 874 *A.*2d 1064. In that regard, we looked behind the fact that Lafayette Yard was incorporated by "public-spirited citizens." *Ibid.* We concluded by noting "that the Mayor and City Council have absolute control over the membership of the Board of Lafayette Yard and that the Corporation *could only have been 'created' with their approval." Ibid.* (emphasis added).

In *Lafayette Yard,* we remained faithful to the text of *N.J.S.A.* 47:1A–1.1 and determined that, in essence, the nonprofit corporation (an "instrumentality") was *created* by a public subdivision therefore making it a "public agency." *See id.* at 535–36, 874 *A.*2d 1064. The creation test, not the governmental-function test, controlled. Our decision in this case, finding that the League of Municipalities is a "public agency," is wholly consistent with our holding in *Lafayette Yard.*

## IV.

Having determined that the League is a "public agency," we reject the League's argument that its records do not fall within

the category of "government record[s]" under OPRA. "Government record" or "record" is defined as

> any paper, written or printed book, document, drawing, map, plan, photograph, microfilm, data processed or image processed document, information stored or maintained electronically or by sound-recording or in a similar device, or any copy thereof, that has been made, maintained or kept on file in the course of his or its official business by any officer, commission, *agency or authority of the State or of any political subdivision* thereof, including subordinate boards thereof, or that has been received in the course of his or its official business by any such officer, commission, *agency, or authority of the State or of any political subdivision* thereof, including subordinate boards thereof. The terms shall not include inter-agency or intra-agency advisory, consultative, or deliberative material.

[*N.J.S.A.* 47:1A–1.1 (emphasis added).]

▮▮▮▮ In short, any document kept on file or received in the course of the official business of an "agency" of a political subdivision is a government document. The League is such an "agency" and therefore the term "government record" applies to it. To conclude otherwise would require us to reach an absurd result. It cannot be that the League meets the definition of "public agency" or "agency," but is not the "agency" referred to in the definition of "government record." Both "public agency" and "government record" are defined in the *same* statute. *See N.J.S.A.* 47:1A–1.1. We must read statutes in harmony with one another rather than in a disjointed fashion in order to give full meaning to the whole of an enactment. *See Burnett, supra,* 198 *N.J.* at 421, 968 *A.2d* 1151.

Because the trial court determined that the League, as a matter of law, was not a "public agency," it did not need to review Fair Share's request for access to particular documents kept or maintained or received by the League. Unless Fair Share and the League can resolve this matter on their own, the trial court must decide whether, under OPRA, the requested documents are sub- · ject to disclosure or subject to an exemption.[8] At any hearing, the

---

8 *See, e.g., N.J.S.A.* 47:1A–1.2 ("biotechnology trade secrets"); *N.J.S.A.* 47:1A–2.2 ("victim's personal identifying information"); *N.J.S.A.* 47:1A–3 ("[r]ecords of investigations in progress").

League, "[t]he public agency[,] shall have the burden of proving that the denial of access is authorized by law." *N.J.S.A.* 47:1A-6.

In light of our decision, we see no reason to address Fair Share's claim under the common law right of access to public records.

## V.

In summary, we hold that the League of Municipalities is a "public agency" under OPRA and must provide access to "government record[s]" that are not subject to an exemption. We therefore reverse the judgment of the Appellate Division and remand to the trial court for proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, RIVERA–SOTO and HOENS—6.

*Opposed*—None.